Archer v Metropolitan Transp. Auth. (MTA) (2025 NY Slip Op 51680(U))

[*1]

Archer v Metropolitan Transp. Auth. (MTA)

2025 NY Slip Op 51680(U)

Decided on October 21, 2025

Supreme Court, New York County

Ally, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on October 21, 2025
Supreme Court, New York County

Lloyd Archer, ANITA CLINTON, JULIO RIVERA, DONOVAN SMITH, HARRIETT BROWN, 
 THOMAS MASSENBURG, EDDIE PENICK, ANDREEVA PINDER, and NEIL THOMAS on behalf of themselves and others similarly situated and on behalf of former and retired 
 MTA/NYCTA employees who are now Medicare eligible Retirees, Petitioners, 
 For a Judgment Pursuant to Article 78 of the Civil Practice Law and Rules

against
Metropolitan Transportation Authority (MTA), NEW YORK CITY TRANSIT (NYCT), 
 TRANSPORT WORKERS UNION OF AMERICA LOCAL 100, RICHARD DAVEY as President 
 of NYCTA, ANITA MILLER as Chief Labor and Employee Relations Officer of MTA, 
 RICHARD DAVIS as President of TWU Local 100, and WILLIAM JEFFERSON as Director of Labor Relations MTA/NYCT, Respondents.

Index No. 161965/2023

Petitioners
Sigurd A. Sorenson, Esq. ([email protected])
Sorenson Law Offices 
546 Fifth Avenue, 6th Floor 
New York, NY 10036 
(917) 916-5196
Respondents Metropolitan Transportation Authority, New York City Transit, Richard Davey, Anita Miller, and William Jefferson 
Neil H. Abramson, Esq. ([email protected])
Rosanne Facchini, Esq. ([email protected])
Olympia Karageorgiou, Esq. ([email protected])
Proskauer Rose LLP 
11 Times Square 
New York, NY 10036 
(212) 969-3001
Respondent Richard Davis
Arthur Z. Schwartz, Esq. ([email protected])
Advocates for Justice
225 Broadway, Suite 1902 New York, NY 10007
(917) 923-8136
Proposed Intervenor Aetna Life Insurance Company
Karl Geercken, Esq. ([email protected])
Sharon Steinerman, Esq. ([email protected])
Kristen C. Kuan, Esq. ([email protected])
Alston & Bird LLP
90 Park Avenue
New York, NY 10016
(212) 210-9400

Shahabuddeen A. Ally, J.

The following e-filed documents, listed by NYSCEF document number, were read on this motion (Seq. No. 3) to/for VACATE: 28-57, 64-71, 73, 135-143
The following e-filed documents, listed by NYSCEF document number, were read on this motion (Seq. No. 4) to/for PARTIES — ADD/SUBSTITUTE/INTERVENE: 78-83, 87-89
The following e-filed documents, listed by NYSCEF document number, were read on this motion (Seq. No. 5) to/for INJUNCTION/RESTRAINING ORDER: 96-113, 120-125, 135-143, 158-168
The following e-filed documents, listed by NYSCEF document number, were read on this motion (Seq. No. 6) to/for DISMISS: 28-57, 96, 126-132, 134-143, 151, 156, 158-168
Petitioners, retired former employees of respondent Metropolitan Transportation Authority (the "MTA") and former members of respondent Transport Workers Union of America Local 100 ("Local 100"), seek, among other things, injunctive relief requiring the MTA and its relevant executives and agencies, including respondent New York City Transit Authority ("NYCTA"), to resume offering its Medicare-eligible retirees supplemental Medicare coverage of the same or substantially similar quality to the supplemental Medicare insurance plan that it offered to its retirees prior to January 1, 2024. (See generally Am. Verified Art. 79 Pet., dated Mar. 11, 2024 ("Am. Pet.") (NYSCEF Doc. 96)) After January 1, 2024, the MTA offered its retirees only allegedly inferior Medicare Advantage plans administered by third-party and proposed intervenor Aetna Life Insurance Company ("Aetna").
Petitioners commenced this hybrid Article 78 proceeding by Verified Petition (the "Petition") filed on December 7, 2023. (See Verified Pet., dated Dec. 5, 2023 ("Pet.") (NYSCEF Doc. 1)) The Petition named as respondents only Anita Miller (as the MTA's Chief Labor and Employee Relations Officer), William Jefferson (as the MTA's Director of Labor Relations), and [*2]Richard Davis (as Local 100's President), and alleged seven causes of action sounding in breach of contract, promissory estoppel, unjust enrichment, negligent misrepresentation, abuse of agency discretion pursuant to CPLR § 7803(3), and violation of Article V, Section 7 of the New York State Constitution. (See id. caption, ¶¶ 55-83) Petitioners sought injunctive relief and the vacating of the MTA's decision to offer only the allegedly inferior Medicare Advantage plans. (See id. ¶¶ 61-62, 66-67, 70, 75, 90)
On or about March 15, 2024, Petitioners filed an Amended Verified Article 78 Petition (the "Amended Petition") that names as additional respondents the MTA, NYCTA, Local 100, and Richard Davey (as NYCTA's President). (See Am. Pet. caption)[FN1]
The Amended Petition maintains essentially the same five causes of action sounding in breach of contract, promissory estoppel, unjust enrichment, and abuse of agency discretion (with the order of the promissory estoppel and breach-of-contract claims reversed and the breach-of-contract claim more well defined) but omits the Petition's two causes of action sounding in negligent representation and violation of the New York State Constitution. (See id. ¶¶ 101-152) The breach-of-contract, promissory-estoppel, and unjust-enrichment claims are alleged against the MTA, NYCTA, and Local 100, while the abuse-of-agency-discretion claims are alleged against all Respondents. (See id.) Significantly, the Amended Petition not only seeks injunctive relief but now also seeks an array of monetary damages, including punitive damages, both on behalf of the individual named Petitioners as well as the entire class of Medicare-eligible NYCTA retirees and their Medicare-eligible dependents. (See id. relief sought ¶¶ A-I)
Currently, four motions are pending before the Court. Petitioners move for a preliminary [*3]injunction mandating that Respondents reinstate the supplemental Medicare plan previously offered to MTA retirees, or otherwise offer a substantially similar supplemental plan, as an option that retirees may choose as part of their MTA-funded healthcare benefits. (See Notice of Mot., dated Mar. 15, 2024 ("NOM") (NYSCEF Doc. 97)) The MTA, NYCTA, Ms. Miller, Mr. Jefferson, and Mr. Davey (collectively, the "MTA Respondents") move, pursuant to CPLR § 7804(f) and 3211(a)(1), (5), (7), and (10), to dismiss the Amended Petition. (Notice of Mot., dated Mar. 25, 2024 (NYSCEF Doc. 126)) Mr. Davis also moves, pursuant to CPLR 3211(a)(2) and (7), to dismiss the Amended Petition.[FN2]
 (OSC to Vacate the TRO and to Dismiss, with Stay, [*4]dated Dec. 22, 2023 (NYSCEF Doc. 73); Notice of Am. Mot. to Dismiss, dated Mar. 25, 2024 (NYSCEF Doc. 134)) Finally, Aetna moves, pursuant to CPLR §§ 1012, 1013, and 7802(d), for leave to intervene in this proceeding. (Notice of Mot., dated Jan. 2, 2024 (NYSCEF Doc. 78)) These motions are consolidated herein for disposition.[FN3]

For the reasons discussed below, Petitioners' motion for a preliminary injunction is DENIED, the MTA Respondents' motion to dismiss the Amended Petition is GRANTED IN PART, Mr. Davis's motion to dismiss the Amended Petition is GRANTED, and Aetna's motion to intervene is DENIED.
I. Background
A. Overview of Original Medicare and Medicare Advantage Plans
Medicare is federal health insurance for people aged 65 or older, and for people younger than 65 with disabilities, that is administered by the Centers for Medicare and Medicaid Services ("CMS"), an agency within the U.S. Department of Health and Human Services. What's the [*5]Difference Between Medicare and Medicaid?, HHS.Gov, https://www.hhs.gov/answers/medicare-and-medicaid/what-is-the-difference-between-medicare-medicaid/index.html (last visited July 9, 2025). Healthcare providers bill Medicare at federally established rates for services rendered to covered individuals, and these bills are paid from two trust funds held by the U.S. Treasury and funded through, among other sources, payroll taxes, Congressional appropriations, and monthly premium payments. See id.; Ctrs. For Medicare & Medicaid Servs., Medicare Gen. Info., Eligibility, & Entitlement Manual § 20.1 (Dec. 21, 2023), 
https://www.cms.gov/regulations-and-guidance/guidance/manuals/downloads/ge101c01.pdf [hereinafter Medicare Manual]; Fee Schedules—General Information, CMS.Gov, 
https://www.cms.gov/medicare/payment/fee-schedules (last visited July 9, 2025).
Medicare consists of four "Parts," denominated Parts A through D. See Parts of Medicare, SSA.Gov, https://www.ssa.gov/medicare/plan/medicare-parts (last visited July 9, 2025). Part A covers inpatient hospital care and related posthospital care in skilled nursing facilities or in the patient's home by a home health agency. See Medicare Manual § 10.1. Most enrollees do not pay a monthly premium under Part A, although an annual deductible must be met before Medicare will begin to pay. What Is Medicare Part A?, HHS.Gov, 
https://www.hhs.gov/answers/medicare-and-medicaid/what-is-medicare-part-a./index.html (last visited July 9, 2025); Costs, Medicare.Gov, https://www.medicare.gov/basics/costs/medicare-costs
(last visited July 9, 2025) [hereinafter Medicare Costs].
Medicare Part B covers a wide range of healthcare services not covered under Part A, including doctors' services and diagnostic procedures. See Medicare Manual § 10.3; What Does Part B of Medicare (Medical Insurance) Cover?, HHS.Gov, 
https://www.hhs.gov/answers/medicare-and-medicaid/what-does-medicare-part-b-cover/index.html 
(last visited July 9, 2025). Part B is an optional supplement to Part A, and individuals who choose to enroll in Part B must pay a monthly premium (in 2025, $185 but potentially higher above certain income levels) and satisfy an annual deductible (in 2025, $257). See Medicare Manual § 10.3; What Are the Medicare Premiums and Coinsurance Rates?, HHS.Gov, https://www.hhs.gov/answers/medicare-and-medicaid/how-much-are-medicare-premiums/index.html (last visited July 9, 2025); Medicare Costs. Together, Parts A and B are known as "Original Medicare." See Your Coverage Options, Medicare.Gov, 
https://www.medicare.gov/basics/get-started-with-medicare/get-more-coverage/your-coverage-options (last visited July 9, 2025) [hereinafter Your Coverage Options].
Once the annual deductibles are met, Original Medicare pays only 80% of the cost of many covered services, leaving the patient to pay the remaining 20% out of pocket as coinsurance. See Medicare Costs; Compare Original Medicare & Medicare Advantage, Medicare.Gov, https://www.medicare.gov/basics/get-started-with-medicare/get-more-coverage/your-coverage-options/compare-original-medicare-medicare-advantage (last visited July 9, 2025) [hereinafter Compare Medicares]. Private insurance companies offer standardized supplemental Medicare insurance policies, known as "Medigap" policies, that cover the 20% coinsurance cost. See Your Coverage Options; Get Medigap Basics, Medicare.Gov, 
https://www.medicare.gov/health-drug-plans/medigap/basics 
(last visited July 9, 2025). Enrollees in Original Medicare may elect to purchase a Medigap policy at their own cost.
Medicare Part C, created by the Balanced Budget Act of 1997, Pub. L. No. 105-33 (1997), and later revised by the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173 (2003), permits private insurance companies to offer insurance [*6]plans that combine Medicare Parts A and B coverage into a single plan. See What Is Medicare Part C?, HHS.Gov, 
https://www.hhs.gov/answers/medicare-and-medicaid/what-is-medicare-part-c/index.html (last visited July 9, 2025) [hereinafter What Is Medicare Part C]. These plans are known as Medicare Advantage plans, or "MAPs," and must follow rules set by CMS and cover the same "medically necessary" services as Parts A and B, but they may also offer additional coverage such as dental, vision, and prescription-drug coverage. See id.; Compare Medicares; Your Health Plan Options, Medicare.Gov, 
https://www.medicare.gov/health-drug-plans/health-plans/your-health-plan-options (last visited July 9, 2025). Nevertheless, MAPs may, among other things, require an enrollee to use doctors or other providers within a predetermined network or service area, may require pre-authorization of certain medical services before coverage applies to them, and "may use their own coverage criteria to determine medical necessity." Compare Medicares. While MAPs pay healthcare providers for rendering covered services based on negotiated rates, the insurance companies offering the MAPs are paid a monthly fixed amount to cover care for each enrollee based on the expected healthcare needs of that individual. See 42 U.S.C. § 1395w-23; What Is Medicare Part C; Cntrs. For Medicare & Medicaid Srvs., Statutory & Plan-Bid Components of the Regional MA Benchmarks, CY 2025, 
https://www.cms.gov/files/document/regional-rates-and-benchmarks-2025.pdf.
Medicare Part D provides coverage for prescription drugs. See What's Medicare Drug Coverage (Part D)?, Medicare.Gov, 
https://www.medicare.gov/health-drug-plans/part-d (last visited July 9, 2025). Part D is not at issue in this action.
B. Healthcare Plans Offered to NYCTA's Medicare-Eligible Retirees
Prior to January 1, 2024, NYCTA provided its Medicare-eligible retirees with at least three healthcare insurance options: its retirees enrolled in Original Medicare could choose to enroll in a Medigap plan, or, alternatively, its retirees could opt to enroll in one of two MAPs. (See Am. Pet. ¶¶ 3-5, 35; Aff. of David Franceschini, sworn to on Dec. 18, 2023 ("Franceschini Aff.") (NYSCEF Doc. 36), ¶ 16)
The Medigap plan—known most recently as the "CPPO Plan"—had been offered to NYCTA retirees, in one form or another, since before 2002, when NYCTA assumed the obligations of the Health Benefit Trust ("HBT") that had previously been administered by Local 100 and provided retiree health benefits to its former members. (See Am. Pet. ¶¶ 3-5; Franceschini Aff. ¶¶ 10-11; id., Ex. 8 (NYSCEF Doc. 44)) Under the terms of the Memorandum of Understanding, dated December 16, 2002, and effective through December 15, 2005 (the "2002 MOU"), which extended the existing collective bargaining agreement between NYCTA and Local 100 (the "CBA"), NYCTA committed to "assume the obligations of the HBT and maintain the current level of [health] benefits," subject to certain adjustments set forth therein. (Franceschini Aff. ¶¶ 8, 10; id., Ex. 1 (NYSCEF Doc. 37) § 4 at p. 16) The 1996 HBT Summary Plan Description for Retirees (the "SPD"), effective at the time the 2002 MOU was executed, provided that the benefits described in the SPD could be amended, modified, or terminated at any time and for any reason, subject to any applicable collective bargaining agreement. (Franceschini Aff., Ex. 8 at ii, 12)
NYCTA also offered MAPs to its retirees prior to the 2002 MOU and NYCTA's assumption of the HBT's obligations. (Aff. of David Franceschini, sworn to on Mar. 18, 2024 ("Franceschini Suppl. Aff.") (NYSCEF Doc. 121), ¶ 3) Aetna began administering those MAPs in 2006. (Id.) The MAPs that were in existence on December 31, 2023, were allegedly designed [*7]collaboratively by Aetna, NYCTA, and Local 100 in 2010 and first offered to NYCTA's Medicare-eligible retirees on January 1, 2011. (Aff. of Richard A. Frommeyer, sworn to on Dec. 18, 2023 ("Frommeyer Aff.") (NYSCEF Doc. 47), ¶ 17; Aff. of Stephen Fisher, sworn to on Mar. 11, 2024 ("Fisher Aff.") (NYSCEF Doc. 125), ¶ 4)
The CBA and 2002 MOU have been extended multiple times, by arbitral decision in 2005 and 2009 and by Memorandum of Understanding between NYCTA and Local 100 in 2014, 2017, 2019, and 2023. (Franceschini Aff. ¶ 9; id., Exs. 2-7 (NYSCEF Docs. 38-43)) Until the most recent Memorandum of Understanding, dated May 30, 2023, and effective May 15, 2023, through May 15, 2026 (the "2023 MOU"), NYCTA continued to offer the CPPO Plan to its retirees. Members of Local 100, all of whom were current NYCTA employees, ratified the 2023 MOU by vote concluding on July 17, 2023. (Frommeyer Aff. ¶ 24) Under the terms of the 2023 MOU, the CPPO Plan was no longer offered to NYCTA retirees, and NYCTA instead offered its retirees the option to enroll in one of only two MAPs administered by Aetna (together, the "Aetna MAPs"). (See Franceschini Aff. ¶ 19; Am. Pet. ¶¶ 35-36) The 2023 MOU expressly provided that "[t]he parties agree that the [Aetna MAPs] will not be a diminishment of benefits for Medicare eligible retirees." (Franceschini Aff., Ex. 7 at 4)
Open enrollment in the Aetna MAPs began on November 1, 2023, and ended on November 30, 2023. (Franceschini Aff., Ex. 9 (NYSCEF Doc. 45) at 4; Aff. of Stephen Scholl, sworn to on Dec. 18, 2023 ("Scholl Aff.") (NYSCEF Doc. 29), ¶ 4) Any NYCTA retiree enrolled in the CPPO Plan who did not voluntarily enroll in one of the new Aetna MAPs or who did not otherwise opt out of the Aetna MAPs entirely by the close of open enrollment was automatically enrolled in the so-called Option 1 Aetna MAP. (See Franceschini Aff., Ex. 9 at 9-10; Am. Pet. ¶ 36) The Option 1 Aetna MAP is allegedly an "enhanced" version of the Option 1 MAP previously offered to retirees, and it differs from the Option 2 Aetna MAP (which remained unchanged after December 31, 2023) primarily in the amount enrollees must pay out-of-pocket and for copayments for doctor visits. (Franceschini Aff. ¶ 19)
More than 20,000 Medicare-eligible NYCTA retirees participated in the three healthcare plans offered prior to January 1, 2024, with total participation in the plans exceeding 30,000 individuals when dependents are included. (Id. ¶ 16) Of those more than 20,000 retirees, approximately 11,000 had been enrolled in one of the MAPs. (Frommeyer Aff. ¶ 27. But see Am. Pet. ¶ 35 ("As of December 31, 2023, approximately two-thirds of Retirees were enrolled in the CPPO plan."))
C. Petitioners
Individual named petitioners are Lloyd Archer, Anita Clinton, Julio Rivera, Donovan Smith, Harriet Brown, Thomas Massenburg, Eddie Penick, Andreeva Pinder, and Neil Thomas. All are former employees of the MTA and former members of Local 100. (See Am. Pet. ¶¶ 13-22; NYSCEF Docs. 4-12; Scholl Aff. ¶ 3) Petitioners Clinton, Rivera, Smith, Massenburg, Pinder, and Thomas were all Medicare-eligible due to age and enrolled in the CPPO Plan prior to January 1, 2024. (Scholl Aff. ¶ 3(c)) After January 1, 2024, all six were defaulted, due to their failure to act during the open-enrollment period, into the "enhanced" Option 1 Aetna MAP. (Id.) Petitioner Archer, while Medicare-eligible, allegedly was not enrolled in the CPPO Plan but was instead enrolled in the original Option 1 MAP. (Id. ¶ 3(b)) He, too, was allegedly defaulted into the "enhanced" Option 1 Aetna MAP. (Id.) Finally, Petitioners Brown and Penick allegedly were [*8]not Medicare-eligible due to age when this proceeding was commenced and, thus, were not enrolled in either the CPPO Plan or one of the original MAPs. (Id. ¶ 3(a))
This proceeding is also brought on behalf of a class defined as "all Medicare-eligible retired MTA workers and their Medicare-eligible dependents," of whom the individual named Petitioners are allegedly representative. (Am. Pet. ¶ 95)
II. Discussion
A. Respondents' Motions to Dismiss
Respondents seek to dismiss the Amended Petition pursuant to CPLR 3211 on both procedural and substantive grounds. The Court addresses the procedural grounds first before addressing the substantive grounds.
i. Procedural Grounds for Dismissal
1. Failure to Timely Commence
Initially, Respondents move, pursuant to CPLR 3211(a)(5), to dismiss the Amended Petition's Third and Fourth Causes of Action as untimely. (See MTA Resp'ts' Mem. of Law in Supp. of Their Mot. to Dismiss the Am. Pet. & in Opp. to Pet'rs' Mot. for a Prelim. Inj., dated Mar. 25, 2024 ("MTA Resp'ts' Mem.") (NYSCEF Doc. 120), at 17-18; Decl. of Arthur Z. Schwartz in Supp. of Mot. to Dismiss the Corrected Am. Pet. & in Opp. to the Mot. for a Prelim. Inj., dated Mar. 25, 2024 ("Schwartz Decl.") (NYSCEF Doc. 135), at 8-9) The Third and Fourth Causes of Action are brought under CPLR Article 78. (See Am. Pet. ¶¶ 127-41) In those causes of action, Petitioners allege that Respondents' elimination of the CPPO Plan was arbitrary and capricious and an abuse of their discretion because it will cause many NYCTA retirees to "face a dangerous disruption in life-saving medical care" and force retirees to "make a highly consequential and irreversible healthcare enrollment decision—and in many instances have made that decision for them through auto-enrollment into Aetna MAP Option 1—without adequate and accurate information." (Id. ¶¶ 128, 135)
"On a motion to dismiss a cause of action pursuant to CPLR 3211(a)(5) as barred by the statute of limitations, [the movant] must establish, prima facie, that the time within which to sue has expired." Flintlock Constr. Servs., LLC v. Rubin, Fiorella & Friedman, LLP, 188 AD3d 530, 531 (1st Dep't 2020) (internal quotation marks and citations omitted). Upon such showing, "the burden shifts to the [non-moving party] to raise a question of fact as to whether the statute of limitations has been tolled, an exception to the limitations period is applicable, or the plaintiff actually commenced the action within the applicable limitations period." Id. (internal quotation marks and citations omitted). "[A]ffidavits may properly be considered, provided that the affidavits come from persons with personal knowledge of the facts." Calltrol Corp. v. DialConnection, LLC, 51 Misc 3d 1221(A), at *5 (NY Sup. Ct. NY Cnty. 2016) (citing Zhinin v. Vicari, 50 AD3d 786, 787 (2d Dep't 2009)).
An Article 78 special proceeding challenging an administrative agency's discretionary determination must be commenced within four months after the determination becomes final. CPLR § 217(1); see also Solnick v. Whalen, 49 NY2d 224, 232 (1980). A determination becomes final once it "impose[s] an obligation, den[ies] a right, or fix[es] some legal relationship as a consummation of the administrative process." Essex Cnty. v. Zagata, 91 NY2d [*9]447, 453 (1998) (quoting Chi. & S. Air Lines v. Waterman Corp., 333 U.S. 103, 113 (1948)). An agency decision is not final if the party's grievance may be "prevented or significantly ameliorated by further administrative action or by steps available to the complaining party." Id. (quoting Church of St. Paul & St. Andrew v Barwick, 67 NY2d 510, 520 (1986)).
Petitioners identify the MTA Respondents' elimination of the CPPO Plan as the agency determination that the Third and Fourth Causes of Actions challenge. (Pet'rs' Mem. of Law in Opp. to Resp'ts' Mots. to Dismiss, dated Apr. 29, 2024 ("Pet'rs' MTD Opp.") (NYSCEF Doc. 151), at 6 ("Here the challenged action is diminishment of Retirees' health benefits by elimination of [Original] Medicare as an option." (emphasis added))) Respondents argue primarily that the decision to eliminate the CPPO Plan was "final and binding" upon Petitioners, thus causing the accrual of Petitioners' claims, when members of Local 100 ratified the 2023 MOU on July 17, 2023. (MTA Resp'ts' Mem. at 17; Schwartz Decl. at 8) In opposition, Petitioners argue, without citation to any legal support, that the four-month limitations period "does not commence and a claim does not accrue until a petitioner knows or reasonably should have known of the challenged action." (Pet'rs' MTD Opp. at 6) The limitations period did not begin to run on July 17, 2023, Petitioners contend, because "Respondents purposely kept [NYCTA's retirees] in the dark about" the elimination of the CPPO Plan. (Id.)
Although Petitioners fail to provide support for their assertion that their Article 78 claims did not accrue until they had or should have had knowledge of the MTA Respondents' elimination of the CPPO Plan, the law does, in fact, require notice. The type of notice depends on the nature of the agency determination as either quasi-judicial or quasi-legislative. See Owners Comm. on Elec. Rates, Inc. v. Public Serv. Comm'n of State of NY, 76 NY2d 779 (1990), rev'g on dissenting op. of Levine, J., 150 AD2d 45, 51-54 (3rd Dep't 1989). Where the agency's determination is quasi-judicial in nature, a petitioner's claim accrues, and CPLR § 217(1)'s four-month statute of limitations begins to run, when the petitioner receives actual notice of the determination. See Owners Comm., 150 AD2d at 52-54. Where the agency's determination is quasi-legislative in nature, however, a petitioner's claim accrues "once the administrative agency's 'definitive position on the issue [becomes] readily ascertainable' to the complaining party." Sch. Adm'rs Ass'n of NY State v. NY State Dep't of Civil Serv., 124 AD3d 1174, 1176-77 (3rd Dep't 2015) (quoting Riverkeeper, Inc. v. Crotty, 28 AD3d 957, 962 (3rd Dep't 2006)); Owners Comm. on Elec. Rates, 76 NY2d 779. "[T]he 'readily ascertainable' requirement is styled as a constructive notice standard; actual, in-hand notice of the underlying determination is not required." Sch. Adm'rs Ass'n of NY State, 124 AD3d at 1177 (citing Riverkeeper, 28 AD3d at 961-62).
To resolve the timeliness of Petitioners' Article 78 claims, therefore, the Court must first determine whether the MTA Respondents' elimination of the CPPO Plan was a quasi-judicial or quasi-legislative exercise of its powers. No party addresses this issue in its filings, and how it should be resolved is unclear. This is due, in part, to the lack of any detailed test or standard in the appellate caselaw for categorizing an agency determination as quasi-judicial or quasi-legislative. In other part, this is because the determination in question is simply not easily categorizable as either.
Owners Committee, the controlling decision of the Court of Appeals, offers only general guidance. In that case, the Public Service Commission of the State of New York (the "Commission") adopted a per-consumer formula for allocating savings realized from purchasing hydroelectric energy from Canada, but an organization composed of New York electricity [*10]consumers brought suit under Article 78 challenging that determination, arguing that the agency should have instead adopted a formula allocating the savings on the basis of kilowatt-hours consumed. Owners Comm., 150 AD2d at 46-47. The Commission issued its determination and mailed it to all interested parties on June 16, 1986. Id. at 47. The petitioner received a copy of the determination three days later, on June 19, 1986, and commenced the proceeding with personal service effected on October 20, 1986. Id. The Commission challenged the proceeding's timeliness, and resolution of that issue turned on when CPLR § 217(1)'s four-month statute of limitations began to run—when the Commission made its determination and placed a copy of it in the mail or, alternatively, when the petitioner actually received notice of the determination. A majority of the Third Department held that the statute of limitations did not begin to run until a petitioner was aggrieved by an agency's determination, that a petitioner was not aggrieved until he received notice of the determination, and that the petitioner in the underlying proceeding had not received notice of the Commission's determination until receipt of the mailing on June 19, 1986; thus, the proceeding was timely. See id. at 49 (citations omitted). The majority expressly rejected the relevance of whether the Commission's determination constituted "the exercise . . . of its quasi-legislative powers as opposed to its adjudicatory powers." Id. at 50.
The Court of Appeals reversed. Owners Comm., 76 NY2d 779. It did so by expressly referencing and adopting the reasoning of the Third Department's dissenting justices. Id. Unlike the majority opinion, the dissenting opinion recognized that first distinguishing between the quasi-judicial or quasi-legislative nature of an agency's determination was necessary to determining the commencement of the limitations period. Owners Comm., 150 AD2d at 53-54 ("[I]n our view, the distinction between quasi-judicial determinations and those which are clearly quasi-legislative continues to exist in applying the Statute of Limitations. Indeed, the distinction is necessary, lest the policy behind the short limitations period in CPLR article 78 cases be undermined."). Notwithstanding such recognition, however, the dissenting opinion offered only broad criteria for making the distinction: "a typical quasi-judicial administrative determination [is one] in which the petitioner was an adversarial party in an administrative proceeding specifically involving the adjudication of his rights," whereas a quasi-legislative determination has "an impact far beyond the immediate parties at the administrative stage." See id. at 52-53; see also id. at 52 ("Under the zone of interest test for determining standing in a CPLR article 78 proceeding, the class of persons sufficiently aggrieved to challenge an agency's determination extends far beyond those who would be entitled to party status at the administrative stage." (citation omitted)). The Commission's determination, according to the dissenting opinion, was an exercise of its quasi-legislative powers. Id. at 52.
More recently, the Appellate Division struggled to categorize an agency determination more similar to the one made by the MTA Respondents and to determine the point of commencement of the statute of limitations. In Knavel v. West Seneca Central School District, the School District discontinued the practice of offering its retirees under the age of 65 the option of carrying their health insurance through the School District's health-insurance plan offered to its active employees. 149 AD3d 1614, 1614 (4th Dep't 2017). By undated letter mailed on June 5, 2014, the School District informed its retirees who had opted to carry such insurance that they would no longer be able to do so starting on July 1, 2014. Id. at 1614-15. The petitioners, affected retirees, commenced an Article 78 proceeding challenging the School District's determination on October 10, 2014. Id. at 1620. The School District subsequently moved to dismiss the petition as untimely. Id. at 1615.
This dispute produced three opinions: a plurality, a concurring, and a dissenting opinion. The plurality opinion rejected the conclusion, conceded by all parties to the proceeding, that the School District's determination was quasi-legislative in nature, doing so because the determination did not affect "the public at large" and because the School District had not established that "actual notice to the affected persons would be impracticable or unduly burdensome." Id. at 1616-17 (citing Essex, 91 NY2d at 453; NY State Ass'n of Counties v. Axelrod, 78 NY2d 158, 165-66 (1991)). By contrast, both the concurring and dissenting opinions determined that the School District's determination was quasi-legislative, not only because the parties conceded as much, but because it had "none of the hallmarks of quasi-judicial decision-making." Id. at 1620, 1622-23. The concurring and the plurality opinions agreed, however, that the proceeding was timely, with the plurality opinion concluding that no evidence of actual notice was provided and the concurring opinion concluding that simply placing the notifying letter in the mail on June 5, 2014, did not render the determination "readily ascertainable" on that date and that evidence of no other notifying procedure had been presented. Id. at 1620-21. The dissenting opinion would have found the proceeding untimely, concluding that the date of mailing of the notifying letter was, "as a matter of public policy, the accrual date." Id. at 1621.
In this Court's view, one significant takeaway from Knavel's fractured decision is that separating agency action into just two categories is perhaps insufficient to accurately capture the full range of action challengeable under Article 78. As broadly defined in Owners Committee, quasi-judicial and quasi-legislative action suggest the exercise of an agency's powers in the course of carrying out its statutory, public-facing mission: the agency adjudicates the rights of parties over which it has jurisdiction under the laws that it was entrusted to administer, or the agency promulgates a rule or regulation or issues a broadly applicable decision pursuant to and in interpretation or enactment of such laws. Neither the School District's determination in Knavel nor the MTA Respondents' determination to eliminate the CPPO Plan fit neatly within either category. Especially so the MTA Respondents' determination, which is embodied in a contractual agreement reached through collective bargaining with the union representing the MTA's own internal workforce. Despite this, Respondents do not argue that the determination is an agency action unchallengeable under Article 78. And there is no legitimate question that an agency's employment decisions are reviewable by a court. Sometimes such decisions may in nature be quasi-judicial, and sometimes not.
Constrained to choose one category or the other, like the concurring and dissenting opinions in Knavel, the Court concludes that the MTA Respondents' determination not to continue offering the CPPO Plan to NYCTA's retirees is best categorized as quasi-legislative. First and foremost, the determination simply does not possess any of "the hallmarks of quasi-judicial decision-making," id. at 1620, in that no party to the 2023 MOU was "an adversarial party in an administrative proceeding specifically involving the adjudication of [their] rights," Owners Comm., 150 AD2d at 53. The MTA Respondents did not adjudicate, pursuant to some law that they were charged with administering, the rights of Local 100 or the NYCTA employees that it represented. Rather, the MTA Respondents engaged in negotiation with Local 100 to reach mutual agreement as to the terms of NYCTA's employees' employment and their and NYCTA's retirees' benefits. Further, although the MTA Respondents' determination is not an administrative rule or regulation, it is arguably a determination affecting parties beyond those at the "administrative stage." Id. at 52-53. Here, the negotiations over the 2023 MOU can be considered the "administrative stage," and NYCTA's approximately 30,000 retirees and their [*11]dependents are the parties affected by the determination but not involved in its making, as only members of Local 100 (which does not include NYCTA retirees) voted to ratify the 2023 MOU. Contrary to Knavel's plurality opinion, there is no indication that, under Owners Committee, an administrative determination must affect "the public at large" in order to be deemed quasi-legislative; the only requirement appears to be that a population beyond those who participated at the administrative stage are affected. While the universe of affected retirees was known, and Respondents' notification to affected retirees itself demonstrates that actual notice was not impracticable, see infra, Owners Committee urged that "the focus should . . . be on the nature of the determination." 150 AD2d at 54. While neither category of administrative action seems to be a perfect fit here, the Court nevertheless concludes that, for the foregoing reasons, the nature of the MTA Respondents' determination is quasi-legislative.
The Court's conclusion is also supported by Petitioners' own arguments. Again, Petitioners argue that the limitations period "does not commence and a claim does not accrue until a petitioner knows or reasonably should have known of the challenged action." (Pet'rs' MTD Opp. at 6) A "reasonably should have known" standard is equivalent to the constructive-notice based "reasonably ascertainable" standard that applies under Owners Committee when an agency takes quasi-legislative action. Thus, Petitioners themselves impliedly, if not expressly, concede that the MTA Respondents' decision to discontinue offering NYCTA retirees the CPPO Plan was quasi-legislative in nature.
Having reached this conclusion, the Court must next determine the point at which the MTA Respondents' determination became "readily ascertainable" to Petitioners, thereby starting the clock on the four-month limitations period. Respondents correctly acknowledge that the limitations period begins to run once an agency's determination is final and binding on a petitioner, and they argue, in the first instance, that the MTA Respondents' determination to eliminate the CPPO Plan became final and binding on Petitioners when the 2023 MOU was ratified on July 17, 2023. (MTA Resp'ts' Mem. at 17; Schwartz Decl. at 8) Whether an agency determination is final and binding on a petitioner, however, turns on whether the petitioner was aggrieved by the determination, and a petitioner must have notice of the determination to be aggrieved by it. See Yarbough v. Franco, 95 NY2d 342, 346 (2000) ("An administrative determination becomes 'final and binding' when the petitioner seeking review has been aggrieved by it." (citations omitted)); Knavel, 149 AD3d at 1620 ("[A] quasi-legislative determination becomes binding, and the statute of limitations begins to run, on the date that the aggrieved party is constructively notified of the challenged determination, i.e., when that determination becomes readily ascertainable to the aggrieved party." (citation omitted)); Guirdanella v. NY State Div. of Hous. & Cmty. Renewal, 165 AD2d 667, 668 (1st Dep't 1990) ("[F]undamental fairness requires that the aggrieved party be notified of the administrative determination before the statutory period in which to seek review commences." (citations omitted)). Thus, Respondents' argument merely begs the question that the Court must answer.
Nevertheless, the Court is convinced that the accrual date of Petitioners' Third and Fourth Causes of Action is indeed the date of the 2023 MOU's ratification. It is well settled that a petitioner is deemed to be on constructive notice of a typical agency quasi-legislative action, such as the issuance of rules, regulations, or decisions, on the date of their promulgation or issuance. See Owners Comm., 150 AD2d at 53 (discussing Biondo v. NY State Bd. of Parole, 60 NY2d 832 (1983)); Sch. Adm'rs Ass'n of NY State, 124 AD3d at 1178; Brennan Ctr. for Justice at NYU Sch. of Law v. NY State Bd. of Elections, 52 Misc 3d 246, 258 (NY Sup. Ct. Albany Cty. [*12]2016) (citation omitted). This, of course, relies on a legal presumption, the purpose of which is to preserve the "strong public policy underl[ying] the abbreviated time frame: the operation of government agencies should not be unnecessarily clouded by potential litigation." Best Payphones, Inc. v. Dep't of Info. Tech. & Telecomm. of the City of NY, 5 NY3d 30, 34 (2005) (citation omitted); see also Owners Comm., 150 AD2d at 53-54 ("[T]he distinction [between quasi-legislative and quasi-judicial determinations] is necessary, lest the policy behind the short limitations period in CPLR article 78 cases be undermined."). Despite the MTA Respondents' determination to eliminate the CPPO Plan not being a rule, regulation, or decision in the typical sense, the legal presumption should apply to it as well.
The Court's conclusion is based on the evidence that Respondents submit in support of their motions or to which they otherwise refer. First, Respondents submit an article, entitled "Retired MTA Workers Worried About Health Benefits In Most Recent TWU Contract," published in the New York Daily News on June 12, 2023, more than a month before the 2023 MOU's ratification. (Schwartz Decl., Ex. H (NYSCEF Doc. 143)) The article states, among other things, that "[r]etired subway and bus operators are up in arms about a change to their health benefits in the most recent contract between the Transport Workers Union and the MTA" and that "[t]he deal—tentatively struck last month but still in need of full ratification by TWU membership—would remove the option of traditional Medicare coverage for retired workers at the state-run MTA." (Id.) The article goes on to state that the "union's two Medicare Advantage plans, both administered by private insurance giant Aetna, would remain as the only premium-free health coverage options for MTA retirees." (Id.)
Second, the MTA Respondents point to the affidavit of Marianna Pizzitola, President of the NYC Organization of Public Service Retirees, that Petitioners themselves submit in support of their motion for a preliminary injunction. (Aff. of Marianna Pizzitola, sworn to on Feb. 19, 2024 ("Pizzitola Aff.") (NYSCEF Doc. 110)) In her affidavit, Ms. Pizzitola attests that, in July 2023, she was interviewed by Local 100's attorney, Arthur Schwartz (who represents Mr. Davis, in his official capacity, in this proceeding), on his WBAI radio show Advocating for Justice, and that during that interview, Mr. Schwartz "noted that he recently had negotiated with NYCTA concerning switching to MAP-only options for the Retirees, and [he] admitted that NYCTA calculated that it would save $72 million per year by getting rid of the CPPO plan." (Id. ¶ 27) Ms. Pizzitola provided a hyperlink to the archived audio of the interview, and the Court has listened to it in full. (Id. ¶ 26 n.3) The MTA Respondents further note that Ms. Pizzitola attests that she, along with a NYCTA retiree, made a recorded telephone call to the MTA's Aetna-dedicated customer service line on October 16, 2023, to allegedly confirm certain of the Petitioners' theories in this proceeding. (See id. ¶¶ 35-42)
Third, the MTA Respondents submit the affidavits of Richard A. Frommeyer, Senior Vice President of Group Retiree Solutions at Aetna, and Stephen Scholl, Deputy Chief Benefits Administration Officer at the MTA. Mr. Frommeyer avers that, on October 10, 2023, Aetna sent an "informational kit," containing "a cover letter with meeting information, benefit summaries, guide, FAQ, For your Doctor, and Continuity of Care form," to all retirees who would be eligible to enroll in the Aetna MAPs. (Frommeyer Aff. ¶ 62) According to Mr. Frommeyer, only 25 retirees ever informed Aetna that they did not receive these materials, and the missing materials were quickly provided. (Aff. of Richard A. Frommeyer, sworn to on Mar. 18, 2024 ("Frommeyer Suppl. Aff.") (NYSCEF Doc. 123), ¶ 60) Similarly, Mr. Scholl avers that, on October 23, 2023, the MTA mailed to all retirees, at their addresses on file with the agency, "an Open Enrollment [*13]postcard announcing the start of the Open Enrollment Period and identifying where additional information could be obtained on an existing employee/retiree portal (www. MyMTA. info) and dedicated site (www.mymta.info/openenrollment)." (Scholl Aff. ¶ 5) A copy of the postcard is attached to Mr. Scholl's affidavit as an exhibit. (Id., Ex. 1 (NYSCEF Doc. 30)) Mr. Scholl further attests that, on October 30, 2023, Local 100 leadership was sent an email with attachments containing "open enrollment benefit packages, forms, FAQs, and postcards applicable to each retiree group" for distribution. (Id. ¶ 6) Copies of the email and its attachments are provided as exhibits. (Id., Exs. 2-4 (NYSCEF Docs. 31-33)) One of the attachments, entitled "2024 Open Enrollment, November 1 — November 30, 2023, Health Benefits Summary," lists only the Aetna MAPs, clearly labeled as "Medicare Advantage," as the healthcare plans available to NYCTA's Medicare-eligible retirees. (Id., Ex. 3 at 9)
These testimony and documents demonstrate that it is appropriate to regard the ratification date of the 2023 MOU as the accrual date. The MTA Respondents' decision to discontinue offering the CPPO Plan to Medicare-eligible retirees was not subject to modification via further administrative action after the ratification, and there is no suggestion otherwise in any of the papers now before the Court. Further, the Daily News article that Respondents submit, and the testimony of Ms. Pizzitola that Petitioners themselves submit, as well as the audio of Ms. Pizzitola's conversation with Mr. Schwartz, demonstrate that the import of the 2023 MOU, specifically, as relevant, the elimination of a Medigap policy in favor of offering only two MAPs, was public knowledge even before it was ratified. Moreover, the MTA's and Aetna's efforts to notify Medicare-eligible retirees of the healthcare plans available to them, not including the CPPO Plan or an alternative Medigap plan, are similar in kind to notification efforts that convinced the Third Department in School Administrators Association to adopt as the claim-accrual date the date of issuance of the subject policy memo. 124 AD3d at 1177-78. The Court emphasizes that by fixing a date upon which the MTA Respondents' determination became "readily ascertainable," the Court is determining constructive notice, a legal fiction, and not actual notice in fact. If, as a policy matter, a petitioner is constructively on notice of an administrative rule, regulation, or decision on the date of promulgation or issuance, even where the only notice of such promulgation may be publication in the State Register, then the present circumstances hardly call for deviation from that policy.
Because the ratification date was July 17, 2023, the four-month statute of limitations expired on November 17, 2023, nearly a month before Petitioners commenced this proceeding. Respondents have thus satisfied their prima facie burden to demonstrate that Petitioners' Third and Fourth Causes of Action are untimely.
Furthermore, the Third and Fourth Causes of Action would still be untimely even if the Court were to consider them as having accrued later, in October 2023, when the MTA and Aetna sent information to NYCTA's Medicare-eligible retirees about the healthcare benefits that would be available to them starting in January 2024. The Amended Petition naming the MTA, NYCTA, Local 100, and Mr. Davey was not properly filed until March 15, 2024. (See Am. Pet.) At the very least, the MTA and NYCTA are necessary parties to this proceeding. See CPLR § 1001(a) (defining parties who must be joined as "[p]ersons who ought to be parties if complete relief is to be accorded between the person who are parties to the action or who might be inequitably affected by a judgment in the action"); Centeno v. City of NY, 115 AD3d 537, 537 (1st Dep't 2014) ("[A] necessary party . . . [is] the agency that made the decision challenged by the petition."). And, as the MTA Respondents correctly argue, the Amended Petition joining the [*14]MTA and NYCTA does not relate back to the original Petition. Cabrera v. City of NY Civil Serv. Comm'n, No. 151196/2018, 2019 WL 112721, at *2 (NY Sup. Ct. NY Cnty. Jan. 2, 2019) (citing Crawford v. City of NY, 129 AD3d 554 (1st Dep't 2015)), aff'd, 181 AD3d 540 (1st Dep't 2020). Therefore, since indisputably necessary parties were not joined in this proceeding until more than four months after October 2023, the Third and Fourth Causes of Action still are untimely even if the ratification date is not the accrual date.
Petitioners fail to raise an issue of fact in response to the motion. Petitioners do not challenge the authenticity or accuracy of the Daily News article or dispute that the Court may consider it in deciding the motion. Nor do Petitioners address the testimony contained in their own submitted affidavit of Ms. Pizzitola or attempt to refute, through testimony or documents, that the MTA and Aetna sent Medicare-eligible retirees information about the healthcare plans that would be available to them.[FN4]

Instead, Petitioners seek to raise an issue of fact by relying exclusively on allegations in the Amended Petition. Specifically, Petitioners point to their allegations that Respondents "obscured that the Traditional Medicare option was being eliminated" "[t]hrough a deceptive promotional campaign led by Aetna and Local 100's president, Respondent Richard Davis" and that "most Retirees were unaware that eliminating the Traditional Medicare option was even being considered, because Local 100 never meaningfully reached out to inform them before the vote." (Pet'rs' MTD Opp. at 6 (citing Am. Pet. ¶¶ 7-8, 85)) These allegations do not sufficiently address the evidence upon which Respondents rely. No details are alleged concerning how Respondents obscured the fact that the CPPO Plan or an alternative Medigap plan would no longer be offered or how the promotional campaign was deceptive vis-à-vis that fact. The allegations also fail to raise any issue of fact concerning the demonstrated public nature of the 2023 MOU's ramifications. Nor do they raise an issue of fact concerning whether the named Petitioners were unaware that the 2023 MOU would eliminate the CPPO Plan—the Amended Petition alleges only that "most Retirees" were unaware of that fact. Additionally, it is unclear what Petitioners mean when they allege that Local 100 never "meaningfully reached out" to Medicare-eligible retirees before the ratification vote or even what kind of outreach would have been "meaningful." In any event, whether Local 100 informed retirees of the vote to ratify the 2023 MOU (in which Petitioners concede that neither they nor any other retiree could have participated (Am. Pet. ¶ 8)) is, at best, only one fact among many to consider in determining constructive notice here—and by no means a determinative fact on its own.
In conclusion, Respondents have satisfied their burden to demonstrate that this proceeding was not timely commenced under CPLR § 217(1)'s four-month statute of limitations, and Petitioners have failed to raise an issue of fact concerning timely commencement. Therefore, the Amended Petition's Third and Fourth Causes of Action are dismissed as untimely pursuant to [*15]CPLR 3211(a)(5).
2. Failure to Join a Necessary Party
The MTA Respondents next contend that Aetna is a necessary party to this proceeding, and thus Petitioners' failure to join Aetna requires that the Amended Petition be dismissed pursuant to CPLR 3211(10).
CPLR 3211(10) provides that a Court may dismiss an action on the ground that the action "should not proceed in the absence of a person who should be a party." CPLR § 1001(a), in turn, governs which persons are necessary parties to an action. It provides that persons "who ought to be parties" are those whose participation in the action is necessary "if complete relief is to be accorded between the persons who are parties to the action" or those "who might be inequitably affected by a judgment in the action." If either of these two criteria are satisfied, the person "shall be made . . . defendant[]." CPLR § 1001(a).
As to the first criterion, the MTA Respondents argue that Aetna is necessary to afford complete relief here because Aetna was the administrator of the CPPO Plan and is the administrator of the Aetna MAPs, and as such, Aetna is necessary for the MTA Respondents "to be able to fully address with and obtain approval from CMS to revert retirees from the MAPs to the CPPO plan as requested in Petitioners' application for injunctive relief." (MTA Resp'ts' Mem. at 15) The MTA Respondents cite to the supplemental affidavit of Mr. Scholl, in which he avers that Aetna's participation is necessary to obtain approval from CMS to move retirees back onto the CPPO Plan should the Court order such relief. (Suppl. Aff. of Stephen Scholl, sworn to on Mar. 18, 2024 (NYSCEF Doc. 129), ¶ 8)
As to the second criterion, the MTA Respondents argue that they and Aetna would be "prejudiced" if Aetna were not joined in this proceeding because the Amended Petition "is replete with allegations that NYCTA Respondents led by and with Aetna purportedly 'colluded' to unjustly enrich themselves and intentionally engaged in 'deceptive' practices in violation of Medicare rules." (MTA Resp'ts' Mem. at 15 (citing Am. Pet. ¶¶ 1, 7, 9-10, 86-91, 134-52)) The MTA Respondents contend that Aetna's participation in this proceeding is necessary both so that they can defend against Petitioners' collusion claims and so that Aetna can defend itself against such claims which are potentially damaging to its reputation. (Id. at 15-16)
In opposition, Petitioners expressly incorporate and rely upon the arguments they make in opposition to Aetna's separate motion to intervene. (Pet'rs' MTD Opp. at 6) In opposition to that motion, Petitioners first argue that a New York court has already rejected Aetna's arguments for intervention in similar circumstances in Bentkowski v. City of New York, No. 154962/2023, 2023 WL 4365379 (NY Sup. Ct. NY Cnty. July 6, 2023). (Pet'rs' Mem. of Law in Opp. to Would-Be-Resp't Aetna's Mot. to Intervene, dated Jan. 17, 2024 ("Pet'rs' Intervene Opp.") (NYSCEF Doc. 87), at 1-2) Second, Petitioners argue that any claim that Aetna's direct participation in the proceeding is necessary so that Aetna can explain key details of the healthcare plans in question, and thereby fully represent Aetna's interest in the proceeding, is "not credible" because the MTA Respondents' and Aetna's interests are aligned, and Aetna will provide the MTA Respondents with the pertinent details where and when necessary. (Id. at 2-3) Third, Petitioners argue that they would be prejudiced by Aetna's direct participation in the proceeding because Petitioners "are funding this case by themselves through grass-roots pleas for donations from their fellow retirees" and would be forced to expend significant amounts [*16]responding to Aetna's filings. (Id. at 3) Even if Aetna is a necessary party, Petitioners argue in opposition to the motion to dismiss, the remedy is not to dismiss the Amended Petition but to instead grant Aetna's motion to intervene. (Pet'rs' MTD Opp. at 6)
The Court is unconvinced by the MTA Respondents' arguments in support of the motion. Initially, the Court finds it significant that Aetna itself has not argued, in its motion to intervene, that it must participate in this proceeding as a named party in order for the Court to be able to grant Petitioners full relief. (See Proposed Intervenor-Resp't Aetna Life Ins. Co.'s Mem. of Law in Supp. of Its Mot. for Leave to Intervene, dated Jan. 2, 2024 ("Aetna Mem.") (NYSCEF Doc. 79), at 8-11) The MTA Respondents' argument to that effect is, in any event, flawed, premised as it is on the notion that Petitioners seek only the reinstatement of the CPPO Plan. In both the Amended Petition and the notice of motion seeking a preliminary injunction, however, Petitioners request an injunction "mandating that [Respondents] reinstate the CPPO plan—or a plan substantially and materially similar to the CPPO plan—as one of the options that Retirees may choose as part of their healthcare benefits paid for by the MTA." (Am. Pet. relief sought ¶ B (emphasis added); NOM at 1-2 (requesting a "preliminary injunction against Respondents mandating that they reinstate the 'CPPO plan' (as that term is defined in the Memorandum of Law)—or a Medigap plan substantially and materially similar to the CPPO plan" (emphasis added))) If the Court finds that Petitioners are entitled to injunctive relief, such relief will be fashioned to reflect Petitioners' request. In other words, Respondents will be required to provide NYCTA's Medicare-eligible retirees the option of enrolling in either the CPPO Plan or a Medigap plan substantially similar to it. In the unlikely event that Aetna refuses to cooperate with Respondents to reinstate the CPPO Plan offering, Respondents may—indeed, must—offer a different Medigap plan with, perhaps, a different administrator. In the end, should the Court find in Petitioners' favor, Respondents will bear the responsibility of offering NYCTA's Medicare-eligible retirees, through any necessary means, a suitable Medigap plan.
The Court is similarly unconvinced that the circumstances of this proceeding are materially different from those at issue in Bentkowski. True, as the MTA Respondents argue, Petitioners include in the Amended Petition a bare handful of allegations that Respondents "colluded" with Aetna to misrepresent certain aspects of the Aetna MAPs in order to enrich themselves (see Am. Pet. ¶¶ 1, 9, 86, 89), and these allegations were not made by the petitioners in Bentkowski. But as the MTA Respondents expressly concede, "the Amended Petition falls short of expressly pleading claims of fraud or civil conspiracy." (MTA Resp'ts' Mem. at 15) Only the Fourth Cause of Action directly incorporated any allegations of misrepresentation, and even those allegations were directed against Respondents. (See Am. Pet. ¶¶ 134-41) Of course, the Fourth Cause of Action has now been dismissed as untimely, as has the Third Cause of Action, and the only causes of action remaining are those for breach of contract, promissory estoppel, and unjust enrichment. Whether Respondents "colluded" with Aetna is legally irrelevant to the resolution of these remaining causes of action. Therefore, Aetna could not possibly be inequitably affected by a judgment on the same remaining causes of action—at least not in any way that the MTA Respondents have argued here.
Like the court in Bentkowski, this Court finds that Respondents' and Aetna's interests in the outcome of this proceeding are aligned, and that Respondents adequately represent Aetna's interests. Respondents seek to avoid having to resume offering NYCTA's retirees the CPPO Plan or an alternative Medigap plan, and Aetna's goal appears to be coextensive with theirs. Although Aetna contends that it must participate in this proceeding as a party because it is "the only entity [*17]adequately equipped to respond to Petitioners' misstatements with respect to the operations of the Aetna [MAPs]" (Aetna Mem. at 10), the MTA Respondents have already demonstrated that they are capable of obtaining evidence from Aetna and that Aetna is willing to provide it. Here, in support of their motion to dismiss and in opposition to Petitioner's motion for a preliminary injunction, the MTA Respondents submit multiple affidavits from Mr. Frommeyer as well as affidavits from M. Catharine Moffitt, M.D., Senior Vice President, Chief Medical Officer at Aetna/CVS Health, and Stephen Fisher, Vice President and Senior Legal Counsel at CVS Health. (See Frommeyer Aff.; Frommeyer Suppl. Aff.; Aff. of M. Catharine Moffitt, M.D., sworn to on Mar. 9, 2025 (NYSCEF Doc. 124) ("Moffit Aff."); Fisher Aff.) Any suggestion, therefore, that Aetna could or would not coordinate with Respondents to present detailed rebuttals to Petitioners' allegations is remarkable, contradicted as it is by the MTA Respondents' own filings in this proceeding, and it is rejected as such.
Cabrera, the only case to which the MTA Respondents cite to support their arguments, is readily distinguishable. In that case, the New York City Department of Correction (the "DOC") brought disciplinary charges against several employees including the petitioner, and those charges were referred to the New York City Office of Administrative Trials and Hearings ("OATH") for a disciplinary proceeding. Cabrera, 2019 WL 112721, at *1. After an eight-day trial, OATH concluded that the DOC's proposed penalty of termination was appropriate. Id. The New York City Civil Service Commission affirmed, and the petitioner commenced an Article 78 proceeding challenging the determination. Id. The trial court denied the petition, holding that the petitioner had failed to name the DOC and the City of New York, both necessary parties, within the CPLR § 217(1)'s four-month limitations period. Id. at *2. The petitioner appealed, but he failed to do so on the grounds of the trial court's denial of the petition for failure to join a necessary party. Cabrera v. City of NY Civil Serv. Comm'n, 181 AD3d 540, 540-41 (1st Dep't 2020). Although finding that the petitioner had thus abandoned those grounds for appeal, the First Department nevertheless held that the DOC was a necessary party that should have been joined. Id. at 541. Because the DOC was the government agency that terminated the petitioner's employment, there was—unlike here—no possible argument that the DOC was not a necessary party. Indeed, the petitioner in Cabrera even conceded that he had failed to join necessary parties. 2019 WL 112721, at *2.
Accordingly, the MTA Respondents' motion is denied to the extent that it seeks to dismiss this proceeding, pursuant to CPLR § 1001(a) and 3211(10), based on Petitioners' failure to join Aetna. Furthermore, because Aetna's arguments in support of its motion to intervene are essentially identical to those it made in Bentkowski, for the reasons set forth in Bentkowski, 2023 WL 4365379, and above, Aetna's motion to intervene, pursuant to CPLR §§ 1012, 1013, and 7802(d), is denied.
3. Failure to Establish Statutory Criteria to Proceed by Class Action
As the third procedural basis for dismissal, the MTA Respondents contend that the Amended Petition should be dismissed, pursuant to CPLR 3211(7), because Petitioners "have not established any, let alone all, of the statutory criteria that would make a class action proceeding permissible." (MTA Resp'ts' Mem. at 18) Petitioners respond that they were only required to adequately plead the statutory criteria, not affirmatively establish that such criteria are satisfied, and that the MTA Respondents' arguments are thus premature. (Pet'rs' MTD Opp. [*18]at 7) In reply, the MTA Respondents clarify that they "unequivocally contest that the Amended Petition sufficiently pleads any and all" of the statutory criteria. (MTA Resp'ts' Mem. of Law in Further Supp. of Their Mot. to Dismiss the Am. Pet., dated May 16, 2024 ("MTA Resp'ts' Reply") (NYSCEF Doc. 156), at 4)
CPLR 3211(a)(7) provides that a court may dismiss a pleading for failure to state a cause of action. "On a motion to dismiss pursuant to CPLR 3211, the pleading is to be afforded a liberal construction." Leon v. Martinez, 84 NY2d 83, 87 (1994) (citation omitted). A court "must accept the facts as alleged in the complaint as true, accord plaintiffs the benefit of every possible favorable inference, and determine only whether the facts as alleged fit within any cognizable legal theory." Goldman v. Metro. Life Ins. Co., 5 NY3d 561, 570-71 (2005) (internal quotation marks and citation omitted). "Whether a plaintiff can ultimately establish its allegations is not part of the calculus in determining a motion to dismiss." EBC I, Inc. v. Goldman, Sachs & Co., 5 NY3d 11, 19 (2005). Still, "conclusory allegations—claims consisting of bare legal conclusions with no factual specificity—are insufficient to survive a motion to dismiss." Godfrey v. Spano, 13 NY3d 358, 373 (2009).
The Court of Appeals has held that "[n]othing in the CPLR provides that a class claim cannot be dismissed, even at the pre-answer stage, for failure to state a cause of action." Maddicks v. Big City Props., LLC, 34 NY3d 116, 123 (2019) (citations omitted). While dismissal of class claims at the pre-answer stage is relief available under CPLR 3211(a)(7), "it will generally be 'premature to dismiss class action allegations before an answer is served or pre-certification discovery has been taken.'" Griffin v. Gregory's Coffee Mgmt. LLC, 191 AD3d 600, 601 (1st Dep't 2021) (quoting Downing v. First Lenox Terrace Assoc., 107 AD3d 86, 91 (1st Dep't 2013), aff'd, 24 NY3d 382 (2014)). Thus, a defendant seeking pre-answer dismissal of class claims bears a heavy burden and will succeed on the motion "only where it 'appears conclusively from the complaint and from the affidavits that there was as a matter of law no basis for class action relief.'" Id. (quoting Downing, 107 AD3d at 91).
"The determination of whether plaintiffs have a cause that may be asserted as a class action turns on the application of CPLR 901." Cupka v. Remik Holdings LLC, 202 AD3d 473, 474 (1st Dep't 2022). Section 901(a) requires that individual claimants satisfy five criteria in order to maintain a suit on behalf of a class: numerosity, commonality, typicality, adequacy of representation, and superiority.
[FN5]
Maddicks, 34 NY3d at 123. These criteria "are to be construed [*19]liberally in favor of class certification." Chernett v. Spruce 1209, LLC, 200 AD3d 596, 598 (1st Dep't 2021) (citation omitted).
The numerosity requirement seeks to ensure that maintaining a claim as a class action serves judicial economy. Where the class would include only a few individuals, class adjudication of their claims would result in only marginal gains in efficiency over adjudication of their claims in individual actions. The Court of Appeals has recognized that "the legislature contemplated classes involving as few as 18 members." Borden v. 400 E. 55th St. Assocs., L.P., 24 NY3d 382, 399 (2014). Here, Petitioners clearly satisfy the numerosity requirement by numbers alone. According to the allegations in the Amended Petition, the proposed class "consists of over 30,000 persons." (Am. Pet. ¶ 96) Joinder of over 30,000 individual actions is clearly impracticable within the meaning of CPLR § 901(a)(1).
The requisite analysis looks beyond mere numbers, however. Any proposed class must also be composed of individuals who have been aggrieved by the conduct forming the basis for the complaint. Batas v. Prudential Ins. Co. of Am., 37 AD3d 320, 321 (1st Dep't 2007); Klein v. Robert's Am. Gourmet Food, Inc., 28 AD3d 63, 71 (2d Dep't 2006) ("[T]he class cannot be so broad as to include individuals who have not been harmed by the defendants' allegedly wrongful conduct." (citation omitted)). If the proposed class definition necessarily encompasses individuals unaffected by the offending conduct, the proposed class is fatally overbroad. See Corsello v. Verizon NY, Inc., 76 AD3d 941, 941 (2d Dep't 2010) (affirming trial court finding that proposed class definition was overbroad), aff'd, 18 NY3d 777 (2012); Mirsky v. Gymies Gym, Inc., No. 503564/21, 2022 WL 114101, at *6 (NY Sup. Ct. Kings Cnty. Jan. 3, 2022) ("Here, the proposed class definition . . . is overbroad because it includes class members with no cause of action against the defendants." (citing Batas, 37 AD3d at 321)); Alix v. Wal-Mart Stores, Inc., 16 Misc 3d 844, 848-49 (NY Sup. Ct. Albany Cnty. 2007) (denying class certification where proposed class was overbroad because it included individuals not affected by allegedly illegal conduct of defendant), aff'd, 57 AD3d 1044 (3d Dep't 2008).
The MTA Respondents argue that a plain reading of the Amended Petition's allegations demonstrate that Petitioners' proposed class is overbroad. The Court agrees. Again, the proposed class is defined in the Amended Petition as "all Medicare-eligible retired MTA workers and their Medicare-eligible dependents." (Am. Pet. ¶ 95) Petitioners also expressly allege, however, that, as of December 31, 2023, the last day on which Respondents still offered the CPPO Plan, "approximately two thirds of Retirees were enrolled in the CPPO plan." (Id. ¶ 35) Thus, according to Petitioners' own allegations, one third of NYCTA's Medicare-eligible retirees were not enrolled in the CPPO Plan when it was eliminated in favor of the Aetna MAPs. Regardless of whether this one third of Medicare-eligible retirees were enrolled in the original Aetna MAPs or not enrolled in any healthcare plan offered by NYCTA at all, such retirees could not have been injured by elimination of the CPPO Plan—they were not, after all, enrolled in it. Yet, under any reading, the proposed class definition necessarily encompasses those unaffected retirees. It is, therefore, plainly overbroad as a matter of law.
Petitioners attempt little argument disputing this conclusion. They rely primarily on the assertion that the MTA Respondents cite certain facts as "undisputed." (Pet'rs' MTD Opp. at 7) Specifically, they challenge the MTA Respondents' assertion that Petitioners do not dispute that retirees enrolled in the original Aetna MAPs were not negatively impacted by the CPPO Plan's elimination. Though unstated, the implication is that Petitioners do dispute that such retirees were injured by the CPPO Plan's elimination. As the Court reads the Amended Petition, [*20]however, nothing therein indicates that Petitioners are seeking to vindicate any injury to retirees who, on December 31, 2023, were enrolled in the original Aetna MAPs. Every cause of action alleged in the Amended Petition seeks relief for injury allegedly caused to retirees who were enrolled in the CPPO Plan. No facts are alleged as to how the new Aetna MAPs are inferior to the original Aetna MAPs; the Amended Petition's focus is, instead, entirely on the alleged inferiority of the Aetna MAPs as compared to the CPPO Plan. Thus, even if Petitioners dispute that retirees enrolled in the original Aetna MAPs were not injured by the elimination of the CPPO Plan, that dispute is irrelevant to the claims asserted in the Amended Petition and cannot rescue the proposed class from its fatal overbreadth.
Although Petitioners' class claims must be dismissed due to the overbroad class definition, the Court is unconvinced that dismissal is warranted at this early stage based on any other class-certification criteria. With regard to the commonality requirement, the MTA Respondents argue that
the individual questions of how the changes effective January 1, 2024, impact an enrollees' current health plan options as well as the benefits received under those plans as compared to their prior benefit entitlements all predominate over any common questions that may exist because the answers to the individual questions will necessarily result in a finding of whether an individual petitioner has suffered injury or not.
(MTA Resp'ts' Mem. at 19) But the Court cannot agree that this is so based solely on a review of the Amended Petition's allegations. The Amended Petition advances the claim that Respondents diminished the healthcare benefits offered to NYCTA's Medicare-eligible retirees by eliminating the CPPO Plan and forcing those retirees who had been enrolled in that plan to enroll in one of the Aetna MAPs. The Amended Petition further specifies the ways in which the Aetna MAPs allegedly constitute a diminishment in retirees' benefits: unlike the CPPO Plan, the Aetna MAPs allegedly require retirees to seek healthcare from practitioners within a defined network and impose additional prior-authorization requirements on retirees, potentially leading to further complications. (See Am. Pet. ¶¶ 45-82) Respondents' liability would be established, under Petitioners' theory of the case, if these alleged in-network and prior-authorization requirements alone constitute diminishment of the healthcare benefits previously offered to retirees under the CPPO Plan. All retirees who had formerly been enrolled in the CPPO Plan but had been forced onto one of the Aetna MAPs would be subject to the same potential diminishment of their benefits.[FN6]
On the face of the Amended Petition, then, common questions appear to predominate as to liability. Whether and to what extent each class member was damaged by any diminishment may, however, differ based on personal circumstances. But it is well settled that "differing amounts of damages to which each individual class member may be entitled does not undermine commonality or weigh substantially against class certification." Konstantynovska v. Caring Prof'ls, Inc., 214 AD3d 405, 406 (1st Dep't 2023) (citation omitted); see also Godwin Realty Assocs. v. CATV Enters., Inc., 275 AD2d 269, 270 (1st Dep't 2000) ("To the extent that [*21]there may be differences among the class members as to the degree in which they were damaged, the court may try the class aspects first and have the individual damage claims heard by a special master or create subclasses." (citations omitted)).
The MTA Respondents offer similarly unconvincing argument with respect to the typicality requirement. They assert that, "[b]ecause the individual Petitioners retired over several distinct contractual periods and are currently in different health benefit plans, different subsets of the proposed class would be governed under different contract terms and have different interests in remedies based on the purported alteration to their level of benefits." (MTA Resp'ts' Mem. at 20) This assertion, however, is not based in the Amended Petition's allegations. Nowhere in the Amended Petition is it stated, nor is it even capable of inference from the allegations therein, that NYCTA retirees who retired over different periods may have different healthcare benefit plans. Nor do the MTA Respondents support their assertion by pointing to specific testimony or documents that they submitted in connection with the motion—if any such evidence could even be considered. It would be premature to dismiss Petitioner's class claims based solely on the MTA Respondents' assertion and prior to the completion of class discovery and a motion for class certification, through which the relevant question of the individual Petitioners' coverage can be appropriately explored.
The Court reaches the same conclusion with respect to the adequacy-of-representation requirement, as to which the MTA Respondents advance a similar argument. (See MTA Resp'ts' Mem. at 21) Additionally, even if, as the MTA Respondents contend, Petitioners Archer, Brown, and Penick cannot adequately represent the proposed class because they were either not enrolled in the CPPO Plan or were otherwise not Medicare-eligible, the MTA Respondents fail to explain why that should result in the wholesale dismissal of Petitioners' class claims. There remains six individual Petitioners—Clinton, Rivera, Smith, Massenburg, Pinder, and Thomas—all of whom it appears that the MTA Respondents may acknowledge are adequate class representatives. Declining to certify Petitioners Archer, Brown, and Penick as class representatives or severing and dismissing the claims of those specific Petitioners seem like viable potential alternatives to dismissing the class claims completely. In the lone case on which the MTA Respondents rely, Banks v. County of Suffolk, the only named plaintiff was found to be an inadequate class representative, and so class certification was denied on that basis. 133 AD2d 438, 438 (2d Dep't 1987). Here, unlike in Banks, there may exist numerous adequate class representatives amongst the individual Petitioners.
Finally, the Court will not dismiss Petitioners' class claims at this early stage based on the superiority criteria. It is well settled that "class certification is inappropriate where governmental operations are concerned, since any relief granted to an individual petitioner challenging a governmental operation will adequately flow to others similarly situated under principles of stare decisis." Davis v. Croft, 237 AD2d 163, 163 (1st Dep't 1997); see also Jones v. Berman, 37 NY2d 42, 57 (1975) ("[I]n this particular situation, where governmental operations are involved, and where subsequent petitioners will be adequately protected under the principles of stare decisis, we are of the opinion that class action relief is not necessary." (internal citation omitted)); DeBlasio v. City of NY, 24 Misc 3d 789, 799-800 (NY Sup. Ct. NY Cnty. 2009) (citing Jones v. Bd. of Educ. of Watertown City Sch. Dist., 30 AD3d 967, 970 (4th Dep't 2006)). The MTA Respondents argue that this principle should apply here to mandate dismissal of Petitioners' class claims, since the MTA Respondents are government entities. (MTA Resp'ts' Mem. at 21) Petitioners respond that there is no per se rule barring class actions against [*22]government entities, citing Ousmane v. City of New York, 7 Misc 3d 1016(A) (NY Sup. Ct. NY Cnty. Apr. 13, 2005), and that the cases on which the MTA Respondents rely are inapposite because they do not involve, as here, an action against both a government entity and a nongovernment entity or one involving a claim for breach of contract. (Pet'rs' MTD Opp. at 7)
While Petitioners are correct that in this action a nongovernment entity is named as a defendant and that claims other than Article 78 claims are asserted, and, further, that these circumstances are distinct from those involved in the MTA Respondents' cited cases, Petitioners make no attempt to explain why that should preclude application of the so-called "government operations rule" here. Simply identifying differences in the circumstances under consideration without explaining how and why those differences should result in the nonapplication of an otherwise applicable principle is insufficient. The Court notes that the First Department has recognized that the government-operations rule applies "whether relief is sought by way of CPLR article 78 or a plenary action." Ferguson v. Barrios-Paoli, 279 AD2d 396, 398 (1st Dep't 2001) (emphasis added) (citations omitted). And stare decisis would apply equally to any Medicare-eligible NYCTA retiree other than the individual Petitioners here who may assert a breach-of-contract claim against Respondents based on the same circumstances and contract on which this proceeding is based. In other words, the principle of stare decisis is not limited to application to claims brought pursuant to Article 78.
As Petitioners allude, however, "[c]lass certification does not cease to be a matter within the court's discretion simply because governmental operations are at issue, though it should be used cautiously in such cases." Ousmane, 7 Misc 3d at *9 (citing Knapp v. Michaux, 55 AD2d 1025 (4th Dep't 1977); Cunningham v. Frucher, 110 Misc 2d 458 (NY Sup. Ct. NY Cnty. 1981)). Indeed, courts recognize and apply certain limited exceptions to the government-operations rule to certify a class even where government operations are the focus of the dispute. DeBlasio, 24 Misc 3d at 799-800, a case to which the MTA Respondents themselves cite, discusses these exceptions. (MTA Resp'ts' Mem. at 21) The exceptions are generally two: (1) where "the government has revealed a demonstrated reluctance to extend mandated relief to parties other than the individual plaintiffs before the court," Legal Aid. Soc'y v. N.Y.C. Police Dep't, 274 AD2d 207, 213 (1st Dep't 2000); and (2) where the case involves money damages and a large, well-defined class of plaintiffs who have already been aggrieved by the government action in question, see Beekman v. City of NY, 65 AD2d 317, 318 (1st Dep't 1979) ("In the case at bar, . . . we are dealing with a large number of people in a class which has already been defined and limited . . . . Each member is seeking damages, and the failure to afford class relief will result in a plethora of cases being brought . . . . To that extent, this case differs from Rivera and its progeny, which dealt with classes with indefinite numbers and with claims against government agencies that would repeatedly arise and which would be best resolved by the doctrine of [s]tare decisis."); see also Watts v. Wing, 308 AD2d 391, 392 (1st Dep't 2003) ("[H]ere the government operations doctrine has no application to limit plaintiffs' access to class-wide relief since the putative class is composed of those for whom the complained-of harm is not merely prospective but, as alleged, already a fait accompli. Under these circumstances, precedent in an individual plaintiff's favor would be of no assistance to the remaining plaintiffs.").
The MTA Respondents argue that Petitioners "have not pled facts that would support a finding that this case falls within an exception" to the government-operations rule. (MTA Resp'ts' Reply at 6) This argument, in turn, raises the issue of what a potential class complaint [*23]must allege, if anything, to demonstrate entitlement to an exception. Every case on which the MTA Respondents rely, and every case that the Court has independently identified, analyzes the applicability of the government-operations rule and its exceptions in the context of a motion to certify a class, not a pre-answer motion to dismiss. There is, therefore, no apparent preexisting analysis of the issue to which this Court may look in deciding the instant motion. The exceptions, furthermore, appear to lend themselves to resolution through the class-certification process. But to hold that a proposed class claim is never appropriately dismissed at the pleading stage based on a failure to adequately plead the superiority criteria, into which the government-operations rule has been incorporated by long-standing judicial precedent, would run counter to the Court of Appeals's and the First Department's endorsement of the dismissal of class claims pursuant to CPLR 3211(a)(7). See, e.g., Maddicks, 34 NY3d at 123; Griffin, 191 AD3d at 601. It follows, then, that a plaintiff who seeks to assert a class claim against a government entity must indeed affirmatively allege facts demonstrating entitlement to an exception to the government-operations rule sufficient to overcome the showing that the defendant government entity would itself need to make in order to succeed on a motion to dismiss pursuant to CPLR 3211(a)(7)—i.e., that the complaint conclusively demonstrates that there is as a matter of law no basis for class-action relief. Griffin, 191 AD3d at 601.
The Court concludes that Petitioners fail to satisfy this standard with respect to the exception for demonstrated government reluctance. As previously stated, that exception to the government-operations rule applies where "the government has revealed a demonstrated reluctance to extend mandated relief to parties other than the individual plaintiffs before the court." Legal Aid Soc'y, 274 AD2d at 213. The language used by the First Department to articulate this exception reveals that it contemplates actual instances, occurring prior to the commencement of the proceeding in which the exception is invoked, of the government entity at issue refusing to apply a court order against it to similarly situated persons. In Legal Aid Society, for example, the First Department reversed the trial court's certification of a class on the ground that "it has not been shown that the [New York City] Police Department has flouted any previous court orders," despite the trial court's conclusion that there had been "continued and obvious resistance on the part of government officials to follow the mandate of the law." Id. (internal quotation marks and citations omitted); see also Jamie B. v. Hernandez, 274 AD2d 335, 337 (1st Dep't 2000) ("There is no indication that defendants have already ignored or willfully violated prior court orders to this effect."). At the same time, "the government operations rule is based on an assumption that the government can be expected to comply with the Court." Ousmane, 7 Misc 3d at *11 (emphasis in original). Taken together, these two things—the requirement of a pre-occurring refusal to abide by a prior court order and the presumption that a government entity will abide by court orders—do not permit a class complaint relying on this exception to the government-operations rule to remain silent as to the "demonstrated reluctance" that will be used to justify the exception's application. Rather, at the very least, a plaintiff must allege that the government entity or entities against which the plaintiff seeks to maintain a class action refused to apply a prior court order to similarly situated individuals or in some other way ignored or willfully violated a prior court order. The more specific the allegations—e.g., by including the when, where, and how of the violation—the better. Here, Petitioners do not satisfy even this minimal requirement, failing to allege anything concerning the MTA Respondents' respect for or application of any prior court order issued against them.
By contrast, nothing that Petitioners allege or fail to allege in the Amended Petition [*24]conclusively demonstrates that the second recognized exception to the government-operations rule could not, as a matter of law, apply to their class claims. Petitioners seek money damages (although the amount to which each member of the putative class is allegedly entitled is currently unresolved). See Ammon v. Suffolk Cnty., 67 AD2d 959, 960 (2d Dep't 1979) (affirming class certification where case involves "readily definable class whose members are seeking not only a declaration of invalidity and a permanent injunction, but also monetary relief in the form of a refund of any 'excess' fees which may have been collected from them"). The putative class is undoubtedly large and could potentially be well defined with minor amendment to the petition. There does not, furthermore, seem to be any real question that Respondents could readily identify each of the aggrieved retirees by consulting their records of which retirees were enrolled in the CPPO Plan prior to January 1, 2024. See Ousmane, 7 Misc 3d at *11 ("The City may easily ascertain who was fined under the penalty schedule, and may provide relief to those individuals efficiently."). Indeed, the MTA Respondents' submissions indicate that they have the ability to identify the affected retirees. And, as discussed above, Petitioners' allegations appear to suggest that common questions of law and fact predominate. Finally, under Petitioners' theory of the case, all Medicare-eligible retirees who were enrolled in the CPPO Plan have already been aggrieved, but these individuals would nonetheless have to await the conclusion of this action before being able to avail themselves of the benefits of stare decisis. See Beekman, 65 AD2d at 318 ("Furthermore, any other retirees in a similar position to that of the present plaintiffs wishing to institute suit would first have to await the outcome of the present action in order to benefit from the doctrine of stare decisis.").
The Court emphasizes that it has not yet ultimately resolved the question of whether Petitioners may rely on this exception to the government-operations rule; rather, the Court merely finds that it would be premature, based solely on the allegations in the Amended Petition, to conclude that this exception could not apply as a matter of law and, accordingly, to dismiss the class claims. Further factual and legal development during the class-certification process could well reveal that Petitioners are not entitled to rely on any exception to the government-operations rule.
4. The Union as an Improper Party
In his motion to dismiss, Mr. Davis, who is sued in his official capacity as President of Local 100, argues that the Causes of Action pleaded in the Amended Petition are de facto claims for breach of Local 100's duty of fair representation, and that Local 100 owes such a duty only to current NYCTA workers, not to retirees. (See Schwartz Decl. ¶¶ 24-25) Mr. Davis further argues that, even if Local 100 owed a duty of fair representation to NYCTA's retirees, Petitioners' claims are still barred under Palladino v. CNY Centro, Inc., 23 NY3d 140 (2014), and Agramonte v. Local 461, District Council 37, American Federation of State, County and Municipal Employees, 41 NY3d 483 (2024). (Id. ¶ 26)
Petitioners fail to address these arguments in their opposition. (See generally Pet'rs' MTD Opp.) This despite the fact that these arguments were raised in all versions of the motion (see supra Note 2), and that Petitioners expressly acknowledge that their opposition was in relation not only to the MTA Respondents' motion but also to Mr. Davis's motion. (Pet'rs' MTD Opp. at 3 ("Petitioners hereby oppose the motions to dismiss of [the MTA Respondents] and of respondent TWU Local.")) That part of Mr. Davis's motion seeking dismissal based on these grounds [*25]should, therefore, be granted as unopposed.
In any event, Mr. Davis is correct that Petitioners' claims against him (and thus also Local 100) are prohibited under GAL § 13, Palladino, and Agramonte. In Agramonte, the Court of Appeals reaffirmed the rule that GAL § 13 bars suits against a union or its representatives sued in an official capacity where damages are sought, except in cases where the plaintiff pleads, and can ultimately demonstrate, that the offending decision was approved by every individual member of the union. 41 NY3d at 489-93. Here, in addition to injunctive relief, Petitioners seek a variety of monetary damages against Respondents, and yet Petitioners fail to allege that all members of Local 100 approved the decision to eliminate a Medigap-plan offering for retirees. (Am. Pet. relief sought ¶¶ A-I)

 * * * **
Accordingly, Respondents' motions to dismiss are granted to the extent that Petitioners' Third and Fourth Causes of Action are dismissed, pursuant to CPLR 3211(a)(5), as untimely; their First, Second, and Fifth Causes of Action are dismissed, pursuant to CPLR 3211(a)(7), for failure to adequately allege the statutory criteria authorizing the maintenance of such claims as class-action claims; and each cause of action is dismissed, pursuant to CPLR 3211(a)(7), as against Mr. Davis and Local 100 for failure to allege that all members of Local 100 approved the decision to eliminate a Medigap-plan offering.
ii. Substantive Grounds for Dismissal
In addition to the procedural grounds addressed above, Respondents also seek to dismiss the Amended Petition's First, Second, and Fifth Causes of Action on substantive grounds pursuant to CPLR 3211(a)(1) and (7).
CPLR 3211(a)(1) provides that a court may dismiss a proceeding based upon "documentary evidence." Dismissal is warranted under 3211(a)(1) only where "the documentary evidence submitted conclusively establishes a defense to the asserted claim as a matter of law." Carlson v. Am. Int'l Grp., Inc., 30 NY3d 288, 298 (2017). Evidence qualifies as documentary evidence within the meaning of 3211(a)(1) only if it is "unambiguous," "essentially undeniable," and of "undisputed authenticity." VXI Lux Holdco S.A.R.L. v. SIC Holdings, LLC, 171 AD3d 189, 193 (1st Dep't 2019) (citation omitted). Qualifying evidence includes "documents reflecting out of court transactions such as 'mortgages, deeds, contracts, and any other papers, the contents of which are essentially undeniable.'" Unlimited Assets, Inc. v. PennyMac Corp., 75 Misc 3d 1238(A), at *2 (NY Sup. Ct. Bronx Cnty. Aug. 8, 2022) (quoting Magee-Boyle v. Reliastar Life Ins. Co. of NY, 173 AD3d 1157, 1159 (2d Dep't 2019)).
"In assessing the legal sufficiency of a claim [pursuant to CPLR 3211(a)(7)], the Court may consider those facts alleged in the complaint, documents attached as an exhibit therefor or incorporated by reference . . . and documents that are integral to the plaintiff's claims, even if not explicitly incorporated by reference." Dragonetti Bros. Landscaping Nursey & Florist, Inc. v. Verizon NY, Inc., 71 Misc 3d 1214(A), at *2 (NY Sup. Ct. NY Cnty. Apr. 28, 2021) (internal quotation marks and citation omitted), aff'd, 208 AD3d 1125 (1st Dep't 2022). Additionally, in the First Department, a defendant moving pursuant to CPLR 3211(a)(7) may rely on extrinsic evidence to challenge the pleading:
A CPLR 3211(a)(7) motion may be used by a defendant to test the facial sufficiency of a pleading in two different ways. On the one hand, the motion may be used to dispose of an action in which the plaintiff has not stated a claim cognizable at law. On the other hand, [*26]the motion may be used to dispose of an action in which the plaintiff identified a cognizable cause of action but failed to assert a material allegation necessary to support the cause of action. As to the latter, the Court of Appeals has made clear that a defendant can submit evidence in support of the motion attacking a well-pleaded cognizable claim.
Basis Yield Alpha Fund (Master) v. Goldman Sachs Grp., Inc., 115 AD3d 128, 134 (1st Dep't 2014) (citing Guggenheimer v. Ginzburg, 43 NY2d 268 (1977); Rovello v. Orofino Realty Co., Inc., 40 NY2d 633 (1976)). "Where extrinsic evidence is used, [and the motion is not converted to one for summary judgment,] the standard of review under a CPLR 3211 motion is 'whether the proponent of the pleading has a cause of action, not whether he has stated one.'" Biondi v. Beekman Hill House Apt. Corp., 257 AD2d 76, 81 (1st Dep't 1999) (quoting Guggenheimer, 43 NY2d at 275), aff'd, 94 NY2d 659 (2000). "'[T]he allegations are not deemed true[, and] [t]he motion should be granted where the essential facts have been negated beyond substantial question by the affidavits and evidentiary matter submitted.'" Id. (quoting Blackgold Realty Corp. v. Milne, 119 AD2d 512, 513 (1st Dep't 1986), aff'd, 69 NY2d 719). "[I]f the defendant's evidence establishes that the plaintiff has no cause of action (i.e., that a well-pleaded cognizable claim is flatly rejected by the documentary evidence), dismissal would be appropriate." Basis Yield Alpha Fund (Master), 115 AD3d at 135.
1. First Cause of Action for Breach of Contract
Petitioners' First Cause of Action alleges that Respondents breached the 2023 MOU by eliminating the CPPO Plan in favor offering NYCTA's retirees only the Aetna MAPs. (See Am. Pet. ¶¶ 101-110; Pet'rs' MTD Opp. at 8-10) Specifically, Petitioners allege that the 2023 MOU contained a so-called "nondiminishment warranty" that Respondents breached because the Aetna MAPs are inferior to the CPPO Plan and thus are a diminishment of NYCTA's retirees' benefits. (See Pet'rs' MTD Opp. at 8-10)
The MTA Respondents contend that the First Cause of Action cannot be maintained and should be dismissed on several grounds. First, the MTA Respondents argue that because Respondents "expressly agreed in and as part of the 2023 MOU itself to undertake the very action and provide the level of benefits that Petitioners argue now violates their rights under the 2023 MOU—i.e., elimination of the CPPO option"—there could be no breach of that agreement as a matter of law. (MTA Resp'ts' Reply at 7 (emphasis in original); MTA Resp'ts' Mem. at 23, 26-27) Second, the MTA Respondents argue that no language in the 2023 MOU or in any of the prior MOUs expressly entitles NYCTA's retirees to a specific healthcare plan or the indefinite offering of any such plans offered at the time of each agreement, and that under the Court of Appeals's decision in Donohue v. Cuomo, 38 NY3d 1 (2022), no inferences "favoring a determination of ambiguity when construing a collective bargaining agreement or favoring the implied vesting of retiree health benefit rights" can be applied by the Court in interpreting any of the MOUs. (See MTA Resp'ts' Mem. at 24-25; MTA Resp'ts' Reply at 8) Third, the MTA Respondents argue that the Aetna MAPs do not in fact diminish the healthcare benefits that Respondents previously offered to NYCTA's retirees under the CPPO Plan. (See MTA Resp'ts' Mem. at 26-30; MTA Resp'ts' Reply at 8-9)
In opposition to the motion, Petitioners concede that they do not contend that they or other Medicare-eligible retirees are entitled under any agreement to the same healthcare benefit plan, namely, the CPPO Plan. (Pet'rs' MTD Opp. at 9) Rather, they maintain that the alleged breach arises solely from the purported "nondiminishment warranty" contained in the 2023 MOU. (See id.) Thus, the Court looks only to the relevant language in the 2023 MOU and not to [*27]any previous MOU.
New York's principles of contract interpretation are well settled. "A written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." Donohue, 38 NY3d at 13 (internal quotation marks and citation omitted). "A contract should be read as a whole to ensure that undue emphasis is not placed upon particular words and phrases." Consedine v. Portville Cent. Sch. Dist., 12 NY3d 286, 293 (2009) (citation omitted). "Courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." Id. (internal quotation marks and citation omitted). "[W]here a contract was negotiated between sophisticated, counseled business people negotiating at arm's length, courts should be especially reluctant to interpret an agreement as impliedly stating something which the parties specifically did not include." Donohue, 38 NY3d at 12 (alteration in original) (internal quotation marks and citation omitted). "The task of the court is to enforce the plain meaning of an unambiguous agreement, rather than to accept a construction that would render a purposeful provision of the contract meaningless." Bluebird Partners, L.P. v. First Fidelity Bank, N.A., N.J., 248 AD2d 219, 224 (1st Dep't 1998) (citations omitted).
"A contract is unambiguous if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion." Id. at 13 (alteration in original) (internal quotation marks and citation omitted). "Ambiguity in a contract arises when the contract, read as a whole, fails to disclose its purpose and the parties' intent, or when specific language is susceptible of two reasonable interpretations." Id. (internal quotation marks and citation omitted). "[A]n ambiguity never arises out of what was not written at all, but only out of what was written so blindly and imperfectly that its meaning is doubtful." Id. (internal quotation marks and citation omitted). "Extrinsic or parol evidence is admissible only if a court finds an ambiguity in the contract." Id. (internal quotation marks and citation omitted). "Determining whether a contract is ambiguous is an issue of law for the courts to decide." Id. (internal quotation marks and citation omitted).
The relevant language in the 2023 MOU reads as follows:
Commencing with open enrollment for the plan year beginning January 1, 2024, Medicare eligible Retirees will be entitled to enroll in either of two TWU Enhanced Retiree Benefits Coverage. The Plan of Benefits for both Coverage options is attached as Attachment "A" to this Agreement and is incorporated herein. The parties agree that the Plan(s) of Benefits will not be a diminishment of benefits for Medicare eligible retirees.
(Franceschini Aff., Ex. 7 at 4)[FN7]
Petitioners focus specifically on the last sentence, which they contend creates the "nondiminishment warranty." Neither Petitioners nor Respondents assert that any part of the relevant language is ambiguous. The Court agrees that the language is unambiguous and thus does not consider any extrinsic evidence, including submitted affidavits, in determining its meaning.
The Court concludes that the 2023 MOU, read as a whole, does not permit Petitioners to [*28]maintain a claim for breach of contract on the grounds asserted in the Amended Petition. Consider, as the Court must, what the subject provision's three sentences say and necessarily imply: Beginning on January 1, 2024 (more than five months after the 2023 MOU was ratified), NYCTA's Medicare-eligible retirees will be able to enroll in one of the Aetna MAPs, the terms of which are known to the parties and directly incorporated by them into the 2023 MOU by reference and attachment, and the parties affirmatively acknowledge that the Aetna MAPs will not, when offered, be a diminishment of such retirees' healthcare benefits, as compared, presumably, to the benefits such retirees were offered on the date of the 2023 MOU's ratification. In context, the last line of the provision cannot be read as reflecting the parties' intent to create a promise or warranty; rather, the language clearly reflects the parties' intent simply to agree that the healthcare plans that the parties agreed under the same agreement to offer to retirees, all the terms of which are already known, satisfy a certain standard. No party could ever sue the other for breach of this provision, except, perhaps, if a party altogether refused to offer the Aetna MAPs after January 1, 2024, or somehow altered the plans' terms from those reflected in the incorporated Plan of Benefits. But even then, in those circumstances, the breach would devolve from the simple agreement to provide the Aetna MAPs with the terms as set forth in Plan of Benefits, not from the reduction in retirees' benefits as compared to those already provided to them under the CPPO Plan. Thus, no party could later sue the other claiming that the benefits provided under the Aetna MAPs were a diminishment of prior benefits offered. The parties expressly agreed that there was no such diminishment.
Petitioners claim to be third-party beneficiaries of the 2023 MOU, and they certainly are. But Petitioners, by their First Cause of Action, impermissibly seek to enforce rights not existing in the 2023 MOU and beyond those held by the parties themselves. Saska v. Metro. Museum of Art, 42 Misc 3d 548, 561 (NY Sup. Ct. NY Cnty. 2013) ("Third-party beneficiaries do not have contractual rights that go beyond or contravene the explicit terms of the contract. . . . Plaintiffs' rights as alleged third party beneficiaries are no greater than those of the City."), aff'd sub nom. Grunewald v. Metro. Museum of Art, 125 AD3d 438 (1st Dep't 2015). Their position suggests that the parties to the 2023 MOU created a warranty the benefits of which could, for the reasons just discussed, only ever be enforced by nonparties. Petitioners provide no support for interpreting the provision as reflecting the parties' intent to do so, and the Court declines to interpret that provision in such a manner.
The Court's interpretation of this provision does not render its last sentence superfluous or meaningless, in contravention of contract-interpretation principles. To the contrary, the Court's interpretation merely gives that sentence its plain and obvious meaning within the surrounding context in which it is used.
If, however, the Court's interpretation of the 2023 MOU is incorrect, and it does in fact afford Petitioners the contractual right to challenge the sufficiency of the level of benefits provided to NYCTA's retirees under the Aetna MAPs, then the Court would conclude that the First Cause of Action should not be dismissed for failure to state a claim. In the Amended Petition, Petitioners allege that the Aetna MAPs are inferior to the CPPO Plan and Original Medicare for a number of reasons, including:
(1) The Aetna MAPs do not afford NYCTA's retirees the same level of choice as Original Medicare because, unlike Original Medicare, the Aetna MAPs rely on a limited network of healthcare providers, and any healthcare provider not in Aetna's network is not required to accept the Aetna MAPs or provide care to retirees covered by them except in [*29]emergency situations. (Am. Pet. ¶¶ 45-47) Many doctors, hospitals, and continuing care facilities do not accept the Aetna MAPs, and many continuing-care facilities also require residents to maintain Original Medicare plus a Medigap plan. (Id. ¶¶ 48-49)
(2) While Original Medicare does not require patients to acquire authorization prior to receiving care except in limited circumstances, the Aetna MAPs "have strict and wide-ranging prior authorization requirements." (Id. ¶ 51) "[P]rior authorization requirements result in the frequent delay and denial of necessary—and even life-saving—care." (Id. ¶ 53) Aetna is "one of the worst offenders" in terms of abusing prior authorizations, having the highest denial rate (12%, twice the national average) of all insurers. (Id. ¶¶ 60-61)
(3) The network and prior-authorization requirements of the Aetna MAPs create the possibility that NYCTA retirees could be forced to bear the burden of payment for any treatment they receive. If a retiree enrolled in the Aetna MAPs chooses to receive treatment from an out-of-network provider, that provider can refuse to bill Aetna directly, in which case the retiree would be required to pay full price for the services upfront and then seek reimbursement from Aetna. (See id. ¶¶ 63-65) Additionally, out-of-network providers are not required to seek prior authorization before treating a retiree enrolled in the Aetna MAPs, and if such a retiree receives treatment from an out-of-network provider who did not seek prior authorization, and Aetna later declines to cover the treatment, the retiree would be forced to bear the full cost of the treatment. (See id. ¶¶ 66-70)
The MTA Respondents challenge these allegations through the testimony of Dr. Moffit, Mr. Frommeyer, and Mr. Franceschini. (See MTA Resp'ts' Mem. at 10-12, 26-28 (citing Moffit Aff.; Frommeyer Suppl. Aff.; Franceschini Aff.; Franceschini Suppl. Aff.)) These individuals' affidavits constitute extrinsic evidence that does not qualify as "documentary evidence" within the meaning of CPLR 3211(a)(1). See Bou v. Llamoza, 173 AD3d 575, 575 (1st Dep't 2019) ("The affidavit of an employee . . . does not constitute 'documentary evidence' for purposes of a motion to dismiss pursuant to CPLR 3211(a)(1)." (citation omitted)); Summer v. Severance, 85 AD3d 1011, 1012 (2d Dep't 2011) ("Here, the affidavits relied upon by the defendant in support of the motion did not qualify as documentary evidence under CPLR 3211(a)(1). In order to be documentary, the evidence must be unambiguous, authentic, and undeniable; thus, affidavits are not considered documentary evidence." (internal quotation marks and citations omitted)). Therefore, in deciding this part of the motion, the Court must apply the standard applicable under CPLR 3211(a)(7) where the movant relies on extrinsic evidence: dismissal is only appropriate "where the essential facts have been negated beyond substantial question by the affidavits and evidentiary matter submitted." Biondi, 257 AD2d at 81.
The MTA Respondents' submitted affidavits do not satisfy this standard. In her affidavit, Dr. Moffit avers that Original Medicare also imposes prior-authorization requirements for certain hospital outpatient department services; repetitive, scheduled non-emergent ambulance transport; certain durable medical equipment, prosthetics, orthotics, and supplies items; and certain home-health services and inpatient rehabilitation services, and thus it is possible that a patient's treatment may also be denied by CMS under Original Medicare. (Moffit Aff. ¶¶ 7-10) Dr. Moffit also disputes Petitioners' allegation that Aetna has the highest rate of prior-authorization denial among insurers, averring that Aetna's denial rate is instead one of lowest compared to other large insurance carriers and that the denial rate under the original Aetna [*30]MAPs ranged between only 0.36% to 0.51%. (See id. ¶¶ 15-18) As to out-of-network providers, Dr. Moffit avers that "most providers who participate in Original Medicare but are not contracted with Aetna will bill Aetna directly, thus obviating the need for a retiree on the Aetna [MAPs] to pay out of pocket for services." (Id. ¶ 21) Dr. Moffit goes on to aver that, "[i]n the unlikely event that an out-of-network provider agrees to treat an Aetna [MAPs] member but refuses to bill Aetna for the service, the member has the option to obtain services from that provider, pay for the services out of pocket, and submit the claim for reimbursement to Aetna." (Id. ¶ 25) In 2022, according to Dr. Moffit, Aetna fully paid 99.42% of reimbursement requests submitted by members of Aetna's group Medicare Advantage plans. (Id. ¶ 26) Finally, Dr. Moffit avers that "[p]rior authorization is not required for covered services received from out-of-network providers," and that "[w]hile it is accurate that out-of-network claims may be denied if they are not deemed medically necessary, this is true for claims processed under Original Medicare as well." (Id. ¶¶ 31, 33) In making medical-necessity determines, Aetna is, according to Dr. Moffit, "required to follow Medicare clinical coverage policies, which provide guidelines for 'medical necessity' and for the clinical interpretations that must be met." (Id. ¶ 33)
Mr. Frommeyer spends a significant portion of his supplemental affidavit recounting the results of two independent surveys that were allegedly conducted of, respectively, enrollees in the original Aetna MAPs and enrollees in the current Aetna MAPs that went into effect on January 1, 2024. (See Frommeyer Suppl. Aff. ¶¶ 7-14, 17-21) According to Mr. Frommeyer, these surveys show widespread satisfaction among enrollees in both the original and current Aetna MAPs. (See id. ¶¶ 12, 18) As to Petitioners' allegations concerning the Aetna MAPs' reliance on a network of providers, Mr. Frommeyer points to a page on Local 100's website that claims that the Aetna MAPs "are good with any Medicare-registered doctor or hospital in the U.S. that accepts payment from Aetna," including "99.997% of the doctors and hospitals that retirees use today." (Id. ¶¶ 32, 35 (citing Enhanced Medical Coverage for Medicare Eligible Retirees, TWULocal100.org, 
https://www.twulocal100.org/story/enhanced-medical-coverage-medicare-eligible-retirees)) Mr. Frommeyer next refers to the same data to which Dr. Moffit refers allegedly showing that Aetna's prior-authorization denial rate under the original Aetna MAPs ranged between only 0.36% to 0.51%. (Id. ¶ 49) Like Dr. Moffit, Mr. Frommeyer also avers that "there are services in Original Medicare for which CMS requires prior authorizations; this is not something unique to Medicare Advantage plans." (Id. ¶ 50)
In his initial affidavit, Mr. Franceschini avers that "Aetna has communicated to NYCTA and we have shared with our Medicare-eligible NYCTA/TWU Retirees that the [Aetna MAPs] offer[] all the coverage provided by Traditional Medicare Parts A and B with enrollees having the freedom to use any provider who participates in Medicare." (Franceschini Aff. ¶ 20) In his supplemental affidavit, Mr. Franceschini avers that the prior-authorization requirements in the current Aetna MAPs are the same as those in the original Aetna MAPs, because Local 100 "requested and was provided data concerning the prior authorization requirements" during discussions leading up to the 2023 MOU and requested "no changes in the prior authorization requirements." (Franceschini Suppl. Aff. ¶ 4)
None of this testimony negates beyond substantial question the essential facts alleged by Petitioners in the Amended Petition. Dr. Moffit and Mr. Frommeyer argue only that Original Medicare also imposes prior-authorization requirements in certain limited circumstances. They do not aver, however, that the Aetna MAPs do not impose prior-authorization requirements that go beyond those imposed by Original Medicare. The Court interprets this omission as a tacit [*31]admission that the Aetna MAPs have broader prior-authorization requirements than Original Medicare. That Aetna's prior-authorization denial rate is allegedly very low, as Dr. Moffit and Mr. Frommeyer aver, does not address the alleged delay that may exist in receiving authorization and any attendant harm to the patient awaiting treatment that may flow from such delay. Further, Dr. Moffit essentially admits, consistent with Petitioners' allegations, that out-of-network providers need not accept the Aetna MAPs or otherwise bill Aetna directly for any services rendered, resulting in patients having to bear, upfront, the full out-of-pocket expense for treatment, even if that expense may later be reimbursed. The surveys to which Mr. Frommeyer repeatedly refers, moreover, do nothing to contradict Petitioners' allegations; they do not show, for example, that the Aetna MAPs do not impose broader prior-authorization requirements or that out-of-network providers may not accept the Aetna MAPS or may refuse to bill Aetna directly. Mr. Frommeyer's reliance on Local 100's own statement on its website, asserting that 99.997% of doctors and hospitals used by retirees accept the Aetna MAPs, is similarly unpersuasive. Not only is it without any supporting proof whatsoever, but it does not actually contradict Petitioners' allegations, because the Aetna MAPs may not be accepted by out-of-network providers that were not used by retirees at the time that the statement was published on the website. In other words, where a retiree could previously have moved anywhere in the country and had access to providers who accepted Original Medicare, the use of a localized network of providers by the Aetna MAPs could create a scenario in which the same retiree would not have access to a preferred provider in the new region of residence who accepts the Aetna MAPs or is willing to bill Aetna directly. Finally, Mr. Franceschini's statements are either too vague to contradict the specific allegations in the Amended Petition or are otherwise irrelevant to them.
The Court simply cannot say that, as a matter of law, the imposition of additional prior-authorization requirements or a scheme of in- and out-of-network providers, both of which could lead to the issues that Petitioners allege in the Amended Petition, does not constitute a diminishment of benefits. Therefore, if the 2023 MOU in fact creates a contractual right for Petitioners to challenge the level of benefits provided under the Aetna MAPs, Respondents' motions to dismiss the First Cause of Action must be denied.
As it stands, however, the Court concludes that the 2023 MOU provides no such contractual right to Petitioners, and thus the MTA Respondents' motion is granted, and the First Cause of Action is dismissed.
2. Second Cause of Action for Promissory Estoppel
Petitioners' Second Cause of Action alleges a claim for promissory estoppel against the MTA Respondents and Local 100. (Am. Pet. ¶¶ 112-126)
Initially, the MTA Respondents contend that the Second Cause of Action should be dismissed as against them based on the well-established rule that, "[a]bsent an unusual factual situation, estoppel is not available against a governmental agency engaging in the exercise of its governmental functions." Advanced Refractory Tech. v. Power Auth. of State of NY, 81 NY2d 670, 677 (1993) (internal quotation marks and citation omitted). The MTA Respondents further acknowledge that the Court of Appeals has recognized an exception to this general rule, permitting the application of estoppel against a government agency where it "acts or comports itself wrongly or negligently, inducing reliance by a party who is entitled to rely and who changes his position to his determinant or prejudice." Bender v. N.Y.C. Health & Hosps. Corp., 38 NY2d 662, 668 (1976).
In opposition to the MTA Respondents' contention, Petitioners concede the existence of the general rule prohibiting application of estoppel against government agencies but argue that the Amended Petition "pleads . . . the facts needed to come within the Bender exception." (Pet'rs' MTD Opp. at 11) As is Petitioners' pattern throughout much of their opposition, however, they offer no further elaboration on their argument, merely referring to paragraphs 112 through 126 of the Amended Petition.
The Court is unconvinced that the Bender exception is applicable to the facts as pleaded in the Amended Petition. The Court of Appeals has made clear that the exception that it recognized in Bender was "addressed to an unusual factual situation"[FN8]
and "is of very limited application and should not be read as diminishing the vitality of the general rule that the doctrine of estoppel is not applicable to agencies of the State acting in a governmental capacity." Hamptons Hosp. & Med. Ctr., Inc. v. Moore, 52 NY2d 88, 93 n.1 (1981); see also NY State Med. Transporters Ass'n, Inc. v. Perales, 77 NY2d 126, (1990) ("While we have not absolutely precluded the possibility of estoppel against a governmental agency, our decisions have made clear that it is foreclosed in all but the rarest cases." (internal quotation marks and citation omitted)). The allegations here do not reflect one of the rare, unusual circumstances that would justify application of estoppel against the MTA Respondents, whom Petitioners do not dispute are government agencies that were acting within the scope of their governmental functions when they negotiated, through collective bargaining with Local 100, the CBA and MOUs in question. Petitioners cite no caselaw in which a court found that the Bender exception applies in circumstances similar or otherwise analogous to those of this case.
The Bender exception expressly requires that the government agency acted wrongfully or negligently and, through that misconduct, induced reliance by the party seeking to invoke estoppel. Bender, 38 NY2d at 668; see also Mt. Vernon City Sch. Dist. v. R.N., 188 AD3d 889, 889 (2d Dep't 2020) ("'Only a showing of fraud, misrepresentation, deception, or similar affirmative misconduct, along with reasonable reliance thereon, will justify the imposition of estoppel.'" (quoting Concerned Port Residents Comm. v. Incorporated Vill. of Sand Points, 291 AD2d 494, 495 (2d Dep't 2002))); Cancel v. Metro. Transp. Auth., 58 Misc 3d 1016, 1020 (NY Sup. Ct. Bronx Cnty. 2018) ("[T]he doctrine of equitable estoppel applies in this context where a defendant either engaged in overt affirmative misleading acts or conduct, or where it failed to act when it had an affirmative duty to do so." (citation omitted)). Petitioners do not plead any facts reflecting that the MTA Respondents engaged in any such misconduct with respect to Local 100 or, more importantly, NYCTA's retirees. They allege only that the MTA Respondents made a [*32]clear and unambiguous promise to NYCTA's retirees "through, inter alia, healthcare- and pension-related documents, verbal communications, and the CBA as extended by various MOUs, including the 2023 MOU," that their healthcare benefits would not be diminished, and that the MTA Respondents further promised, through unspecified means, that a Medigap plan option for retirees would not be eliminated. (Am Pet. ¶¶ 112-114) Nothing about this conduct, as alleged, strikes the Court as wrongful or negligent within the very circumscribed meaning of the Bender exception. Indeed, agreements reached through arms-length collective bargaining with the union representing a government agency's employees, as the CBA and MOUs are here, cannot and do not qualify as wrongful or negligent acts. At bottom, Petitioners allege nothing more than a garden-variety promissory estoppel scenario, not some unusual set of facts or any specific, egregious misconduct by the MTA Respondents or their representatives. If these ordinary allegations qualify for the exception, then the exception would threaten to swallow the general rule.
Nevertheless, despite all of the foregoing, Bentkowski mandates that the Court find that estoppel can be applied to the MTA Respondents in these circumstances. In Bentkowski, the First Department affirmed the trial court's holding that the petitioners were likely to succeed on their promissory-estoppel claim against the City of New York, thus prohibiting the City from moving forward with its plan to replace the Medigap plan offered to its retirees with a Medicare Advantage plan. Bentkowski v. City of NY, 229 AD3d 95, 102 (1st Dep't 2024). In so doing, the First Department rejected the City's reliance on the general rule prohibiting the application of estoppel against government agencies, holding instead that "the doctrine is available against a governmental actor 'with respect to its discretionary actions' in making employment-related decisions where no statute or ordinance bars the promised action." Id. (quoting Walter v. City of NY Police Dep't, 256 AD2d 8, 9 (1st Dep't 1998)).[FN9]
The Court of Appeals subsequently [*33]reversed the First Department but did so on other grounds. Bentkowski v. City of NY, — N.Y.3d —, 2025 WL 1697939 (2025).
The MTA Respondents argue that, in entering into the MOUs, NYCTA was acting in accordance with its statutory grant of authority under New York Public Authorities Law § 1204(6), which provides that NYCTA has authority to "appoint employees and fix their compensation." (MTA Resp'ts' Mem. at 30) As discussed, Petitioners do not dispute this. The MTA Respondents do not, however, argue or present the Court with any evidence that a statute or ordinance bars NYCTA from providing retirees with a Medigap policy during their lifetime or from promising not to diminish retirees' healthcare benefits. Such promises, if they were made to retirees, are discretionary employment-related decisions, and so the rule applied by the First [*34]Department in Bentkowski must also apply here.[FN10]

Moving on to consideration of the merits of Petitioners' promissory-estoppel claim, the Court concludes that it should not be dismissed on those grounds either. Assuming that an independent claim for promissory estoppel exists—something that the Court of Appeals called into question but ultimately declined to decide in Bentkowski [FN11]
—the parties agree that, to maintain such a claim, there must be a showing of "a clear and unambiguous promise, reasonable and foreseeable reliance by the party to whom the promise [was] made, and an injury sustained in reliance on that promise." Odonata Ltd. v. Baja 137 LLC, 206 AD3d 567, 569 (1st Dep't 2022) (citation omitted).
The parties' arguments focus primarily on the first element of a "clear and unambiguous promise." As just discussed, Petitioners allege that, "[o]ver the last two decades, Respondents Local 100 and MTA/NYCTA made a clear and unambiguous promise to all Retirees that their healthcare benefits would not be diminished," said promise having been made "through, inter alia, healthcare- and pension-related documents, verbal communications, and the CBA as extended by various MOUs, including the 2023 MOU." (Am. Pet. ¶¶ 112-113) Again, Petitioners also allege that the MTA Respondents and Local 100 "made a clear and unambiguous promise to all Retirees that their Traditional Medicare plus Medigap option would not be taken away." (Id. ¶ 114)
The MTA Respondents contend that the Second Cause of Action must be dismissed based on documentary evidence, namely, the SPD, the CBA, and the various MOUs. (MTA Resp'ts' Mem. at 31; MTA Resp'ts' Reply at 10) Unlike the testimony in the affidavits that the MTA Respondents submit, the Court may consider these documents as "documentary evidence" within the meaning of CPLR 3211(a)(1). Therefore, the Second Cause of Action may be dismissed pursuant to these documents only if they "conclusively establish[] a defense . . . as a matter of law." Carlson, 30 NY3d at 298.
Initially, the Court must reject Petitioners' reliance on the 2023 MOU to support their promissory-estoppel claim. The notion that Respondents could be estopped from eliminating the [*35]CPPO Plan (and thus allegedly diminishing retirees' healthcare benefits) by a promise allegedly made in the very agreement by which the CPPO Plan is eliminated is illogical. There is no possible way, in a universe governed by a linear progression of time, for NYCTA's retirees to have relied on the alleged promise in that agreement to their detriment. And, in any case, as the Court has discussed above, the relevant language in the 2023 MOU makes no enforceable promise to the retirees.
Going back to the CBA, there is no provision in that agreement clearly and unambiguously guaranteeing that NYCTA's retirees would be entitled to a Medigap plan or to the nondiminishment of the healthcare benefits they were currently receiving, either in the short term or during their lifetime. In Section 1.11 of the CBA, the parties agreed only that "the Welfare Benefit Trust shall maintain the current benefits through December 31, 2000," and that after that date, NYCTA "will commence making monthly defined contributions to the Welfare Benefit Trust Fund." (Franceschini Aff., Ex. 1, § 1.11(B1-B2), at p. 141) Additionally, by its own terms, the CBA was effective only between December 15, 1999, and December 15, 2002 (see id. at p. 127), with that limited term being the very reason why subsequent MOUs were required. Thus, even if there had been a promise within the CBA that retirees' benefits would not be diminished, that promise must need be interpreted within the context of the agreements' limited term.
While it is true that, under the 2002 MOU, NYCTA committed to "assum[ing] the obligations of the HBT and [to] maintain[ing] the current level of benefits," that commitment does not clearly and unambiguously guarantee a lifetime Medigap-plan offering. (Id. § 4 at p. 16) Further, the 2002 MOU was also expressly term-limited, remaining effective only through December 15, 2005. (Id. § 1 at p. 15) The commitment to "maintain the current level of benefits" must, therefore, be understood only to last until the expiration of the 2002 MOU on December 15, 2005, and no longer.
The 2002 MOU must also be understood in context of the SPD, these same types of documents being essential to the analysis that the Court of Appeals undertook in Bentkowski. See 2025 WL 1697939, at *3-5. The SPD, which the MTA Respondents represent, without dispute from Petitioners, was effective at the time the 2002 MOU was executed, expressly provides that the benefits described in the SPD could be amended, modified, or terminated at any time and for any reason, subject to any applicable collective bargaining agreement. (Franceschini Aff., Ex. 8 at ii, 12)
The CBA was next extended twice by arbitral decision. Neither decision contains any language that could be interpreted, under even the most generous reading, as purporting to promise retirees a Medigap plan or the nondiminishment of their healthcare benefits either during the terms of the decisions (respectively, December 16, 2005, through January 15, 2009; and January 16, 2009, through January 15, 2012) or during their lifetime. (See id., Exs. 2-3) Neither decision, therefore, supports Petitioners' claim.
Likewise, the MOU to which the MTA Respondents and Local 100 next voluntarily agreed, with an effective term of January 16, 2012, through January 15, 2017, contains no language addressed to retirees' entitlement to a Medigap plan or to the nondiminishment of their healthcare benefits. (See id., Ex. 4)
The subsequent MOU, which was effective between January 16, 2017, and May 15, 2019, acknowledged that NYCTA and Local 100, "pursuant to the 2002 — 2005 Agreement, agreed to maintain the level of health benefits" and provided that the "existing transition to [*36]Aetna shall continue to be advanced cooperatively." (Id., Ex. 5 at 1) This language cannot be interpreted as a clear and unambiguous promise to a lifetime Medigap-plan offering; indeed, the same provision refers to a transition of healthcare benefits to Aetna. Nor can the relevant language be interpreted as a clear and unambiguous promise that retirees' healthcare benefits would not be diminished in the future, as the plain language reads as a mere acknowledgement of a past agreement. To the extent that it could be read as a present promise to maintain the level of retirees' healthcare benefits going forward, the promise would still be term-limited commensurate with the express 28-month term of the MOU.
Finally, the last MOU agreed to prior to the 2023 MOU contains no language addressed to retirees' entitlement to a Medigap plan or to the nondiminishment of their healthcare benefits. (See id., Ex. 6 at 2)
In sum, there is no clear and unambiguous promise contained in the CBA, the SPD, or the MOUs supporting Petitioners' claim that Respondents are estopped from eliminating the CPPO Plan or otherwise diminishing the healthcare benefits offered to NYCTA's retirees via a subsequently negotiated MOU (i.e., the 2023 MOU).
But Petitioners did not allege that these documents were the only source of the promise that retirees' benefits would not be diminished. To the contrary, Petitioners also expressly allege that this promise was made in "healthcare- and pension-related documents" and in separate "verbal communications." (Am. Pet. ¶¶ 112-113) Respondents ignore these allegations, however, focusing their arguments entirely on the CBA and the MOUs. While the CBA and the MOUs do not support Petitioners' promissory-estoppel claim, as just discussed, they also do not contradict the allegation that promises were made to NYCTA's retirees through other means, including through oral or other verbal communications. Without knowing what those promises were, in what context they were made, who made them, and on what they may have been based, it cannot be determine whether those promises are clear and unambiguous or, even if so, whether they are binding on Respondents.
The motion currently under consideration is a motion to dismiss, and thus there is no complete record before the Court. This distinguishes the instant motion from the preliminary-injunction motion that the Court of Appeals reviewed in Bentkowksi. In Bentkowski, the parties stipulated to the completeness of the record. 2025 WL 1697939, at *3. There, before the Court of Appeals for consideration were not only all of the SPDs and cover letters in question but also affidavits from hundreds of retirees. Id. at *2-3. The Court of Appeals found that the SPDs contained no language clearly and unambiguously promising the City's retirees lifetime entitlement to a Medigap plan. Id. at *4. The Court of Appeals further rejected the Bentkowski petitioners' reliance on the retiree affidavits either because the promises they allege were made were nonetheless expressly founded in the SPDs or because the promises were otherwise not clearly and specifically described by the affiant. Id. But the Court of Appeals did not hold that the City could not, as a matter of law, be estopped by clear and unambiguous promises made to retirees in official documents or in oral or other communications with representatives of the City. Thus, that leaves open the possibility here that Respondents could be estopped by promises potentially made to NYCTA's retirees in the alleged "healthcare- and pension-related documents" and other "verbal communications."
Accordingly, there is a gap in the MTA Respondents' motion that prevents the Court from granting it with respect to the Second Cause of Action based on the absence of a clear and unambiguous promise.
As for the remaining elements of reliance and injury, the Court concludes that Petitioners' allegations, at paragraphs 116 through 123 of the Amended Petition, are sufficient to withstand dismissal. The MTA Respondents direct their arguments exclusively toward the affidavits that Petitioners submit in support of their separate motion for a preliminary injunction, not the allegations in the Amended Petition. (See MTA Resp'ts' Mem. at 32-33) Whether those affidavits are sufficient to demonstrate likelihood of success or irreparable harm and entitlement to a preliminary injunction is a question different from whether the Amended Petitions' allegations are sufficient to state a claim. The Court, furthermore, has already determined that Petitioners' allegations concerning the diminishment of retirees' benefits are sufficient to withstand the MTA Respondents' motion to dismiss.
Therefore, the MTA Respondents' motion to dismiss the Second Cause of Action on substantive grounds is denied.
3. Fifth Cause of Action for Unjust Enrichment
Petitioners' Fifth Cause of Action alleges a claim for unjust enrichment against the MTA Respondents and Local 100. (Am. Pet. ¶¶ 143-152)
It is well-established that "[a]n unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim." Corsello v. Verizon NY, Inc., 18 NY3d 777, 790-91 (2012). The MTA Respondents argue that Petitioners' unjust-enrichment claim is duplicative of their breach-of-contract claim. (MTA Resp'ts' Mem. at 36-37) In opposition, Petitioners expressly concede that point. (Pet'rs' MTD Opp. at 11 ("The MTA is correct that the unjust enrichment claim is duplicative of the contract claim.")) Accordingly, the the Fifth Cause of Action is dismissed.
B. Petitioners' Motion for a Preliminary Injunction
Although the granting of Respondents' motions to dismiss technically renders Petitioners' motion for a preliminary injunction moot, the Court, for the sake of completeness, nonetheless briefly considers and determines the preliminary-injunction motion.
Petitioners move for a preliminary injunction requiring Respondents to resume offering NYCTA's retirees the CPPO Plan or, alternatively, a Medigap plan of substantially similar quality. (See NOM at 1-2) Respondents oppose the motion. (See MTA Resp'ts' Mem.; Schwartz Decl.) Petitioners, however, fail to submit a reply to the opposition. (See generally NYSCEF Dkt.; Pet'rs' MTD Opp.)
"The party seeking a preliminary injunction must demonstrate a probability of success on the merits, danger of irreparable injury in the absence of an injunction and a balance of equities in its favor." Nobu Next Door, LLC v. Fine Arts Housing, Inc., 4 NY3d 839, 840 (2005) (citing CPLR § 6301). Each of these three elements must be demonstrated by the movant by clear and convincing evidence. Gilliland v. Acquafredda Enters., LLC, 92 AD3d 19, 24 (1st Dep't 2011); see also J.S.I.K. Int'l LLC v. Schuster, 225 AD3d 472, 473 (1st Dep't 2024) ("[Movants] failed to show by clear and convincing evidence a danger of irreparable injury in the absence of an injunction and a balance of equities in [their] favor." (second alteration in original) (internal quotation marks and citation omitted)).
The movant's burden is even higher where a mandatory injunction is sought. "[A] mandatory preliminary injunction (one mandating specific conduct), by which the movant would receive some form of the ultimate relief sought as a final judgment, is granted only in 'unusual' [*37]situations, where the granting of the relief is essential to maintain the status quo pending trial of the action." Second on Second Café, Inc. v. Hing Sing Trading, Inc., 66 AD3d 255, 264-65 (1st Dep't 2009) (internal quotation marks and citation omitted). Additionally, it is well settled that, "[a]bsent extraordinary circumstances, a preliminary injunction will not issue where to do so would grant the movant the ultimate relief to which he or she would be entitled in a final judgment." Emanuel Mizrahi, DDS, P.C. v. Angela Andretta, DMD, P.C., 170 AD3d 1120, 1123 (2d Dep't 2019) (internal quotation marks and citation omitted). It cannot be disputed that the preliminary injunction that Petitioners seek here is a mandatory injunction that would grant Petitioners the ultimate relief that they seek in a final judgment. (Compare Am. Pet. relief sought ¶ B, with NOM at 1-2)
Whether to grant or deny a preliminary injunction "is committed to the sound discretion of the motion court." Harris v. Patients Med., P.C., 169 AD3d 433, 434 (1st Dep't 2019) (citing Doe v. Axelrod, 73 NY2d 748 (1988)).
i. Likelihood of Success on the Merits
Petitioners expressly ground their motion for a preliminary injunction in their First and Second Causes of Action for, respectively, breach of contract and promissory estoppel. (Pet'rs' Mem. of Law in Supp. of Mot. for Prelim. Inj., dated Feb. 19, 2024("Pet'rs' Prelim. Inj. Mem.") (NYSCEF Doc. 98), at 15 ("The instant motion confines itself to Retirees' breach of contract claim, or, in the alternative, their promissory estoppel claim.") Accordingly, the Court's analysis is limited to those causes of action.
For the reasons already discussed at length above, Petitioners are unlikely to succeed on the merits of their First Cause of Action for breach of contract. The 2023 MOU does not afford Petitioners the contractual right that they assert. The language of the relevant provision is clear and unambiguous, so, as previously stated, in accordance with well-settled rules, the Court does not consider any affidavits—whether submitted by Petitioners or Respondents—in interpreting that provision's meaning and effect.
If, however, the Court's interpretation of the contractual language is incorrect, the Court would conclude that Petitioners have sufficiently demonstrated a likelihood of success on the merits of their breach-of-contract claim. The reasons for this conclusion are essentially those already discussed herein when the Court concluded, in the alternative, that it would deny the MTA Respondents' motion to dismiss if the 2023 MOU did in fact permit Petitioners to challenge the sufficiency of the level of benefits provided under the Aetna MAPs. In short, the affidavits that the MTA Respondents submit do not demonstrate that the Aetna MAPs have the same or fewer prior-authorization requirements than Original Medicare; that the prior-authorization requirements under the Aetna MAPs would not lead to the delayed provision of services; or that the network of providers imposed on NYCTA's retirees would not force some to pay upfront for services provided by out-of-network doctors or hospitals or to forego using preferred providers who will not accept the Aetna MAPs or bill Aetna directly. While the Court does not credit the affidavits that Petitioners submit in support of their motion that were originally submitted in Bentkowski to the extent that such affidavits opine on the MAP at issue in that case, because Petitioners do not sufficiently establish that that MAP is materially the same as the Aetna MAPs, Petitioners have sufficiently established, through those affidavits and their other submissions, that the Aetna MAPs have additional prior-authorization requirements and [*38]impose a network of providers on enrollees, and that these things can potentially create obstacles to NYCTA's retirees receiving the healthcare that they need from their preferred providers, which obstacles did not previously exist under the CPPO Plan. In their submissions, the parties do not discuss what the scope of the term "benefits" is, but as it stands now, the Court is inclined to find that these differences and their potential consequences constitute a diminishment in the healthcare benefits provided to retirees.
With respect to Petitioners' Second Cause of Action for promissory estoppel, the Court likewise concludes that Petitioners are unlikely to succeed on the merits of that claim. As discussed at length above in the context of deciding the MTA Respondents' motion to dismiss, none of the CBA, the SPD, or the MOUs contains a clear and unambiguous promise to the effect that Respondents would not eliminate the CPPO Plan (or a Medigap-plan offering altogether) or would not otherwise diminish the healthcare benefits offered to NYCTA's retirees. That conclusion remains the same in the context of deciding Petitioners' instant motion for a preliminary injunction.
Unlike with the MTA Respondents' motion to dismiss, however, it is Petitioners' burden on this motion to come forward with evidence demonstrating the existence and nature of any promise on which they rely made in another document or through other communications with NYCTA's retirees. Petitioners have failed to do so. They submit no documentary proof of a promise other than those allegedly made in the CBA, the SPD, or the MOUs, and they submit only three affidavits from NYCTA retirees in support of the motion that relate to such a promise. In his submitted affidavit, Eric B. Josephson, a Medicare-eligible former NYCTA employee, avers that, "when [he] was working, the Union and NYCTA repeatedly assured us that the traditional Medicare plus supplemental option would not be taken away, and I relied on those assurances in planning my retirement." (Aff. of Eric B. Josephson, sworn to on Jan. 31, 2024 ("Josephson Aff.") (NYSCEF Doc. 108), ¶¶ 1, 4) And Gricelia Amodeo, another Medicare-eligible former NYCTA employee, avers that "NYCERS and the business office of the MTA told me I would have Medicare when I became Medicare eligible." (Aff. of Gricelia Amodeo, sworn to on Jan. 5, 2024 ("Amodeo Aff.") (NYSCEF Doc. 107), ¶¶ 2-3) Neither affiant, however, provides details on these alleged assurances, such as who, specifically, made them, when, or how or what the asserted basis for the assurances were. On any motion for a preliminary injunction, such unparticularized averments would be insufficient to meet the movant's burden to demonstrate, with evidence, a clear and unambiguous promise. Here, where the injunction sought is a mandatory injunction, and where the affiants are not any of the individual Petitioners, such averments are woefully insufficient to carry Petitioners' heavy burden to show that clear and unambiguous promises were made to them or were otherwise widely made to NYCTA's retirees, by individuals with authority to make them,[FN12]
such that [*39]Respondents could be found to be estopped from no longer offering all retirees a Medigap plan.
The third affidavit is from Roger Toussaint, an employee of the MTA Respondents from 1984 until 2012 and President of Local 100 from January 2001 until December 2009. (Aff. of Roger Toussaint, sworn to on Feb. 16, 2024 ("Toussaint Aff.") (NYSCEF Doc. 106), ¶ 2) He avers that, as President of Local 100, he was involved in the negotiation of the 2002 MOU as well as the MOUs whose terms were allegedly later imposed by arbitral decision in 2005 and 2009. (See id. ¶ 6) According to Mr. Toussaint, the "2002 MOU was momentous because in it the MTA agreed to guarantee the health benefits [sic] . . . ; to maintain the level of health benefits that Union members, pre-Medicare retirees, and Medicare-eligible retirees . . . were receiving as of December 2002; and to assume responsibility for paying all associated costs." (Id. ¶ 7 (emphasis in original)) As to Medicare-eligible retirees, Mr. Toussaint further avers that "those benefits included a 'Medigap' insurance policy to cover the 20% of medical expenses not covered by traditional Medicare." (Id. ¶ 8) After the 2002 MOU was signed and before it was ratified, Mr. Toussaint claims that he and other members of Local 100 leadership held meetings and assemblies with "a large majority of the Union's 36,000 members" and that, "[d]uring these meeting and assemblies, we repeatedly made the same clear and specific promise to the Union's members that MTA made to us in the 2002 MOU: a Retiree's right to Medigap coverage and prescription drug coverage would now be guaranteed and would not be diminished." (Id. ¶¶ 14-15) As to the purported MOUs imposed by arbitral decision in 2005 and 2009, Mr. Toussaint avers that he and other union leadership again held meetings with a large majority of union members related to those agreements and, during those meetings, again "emphasized the rock-solid promise that the MTA had made to us, and that Local 100 had made to the Retirees: namely, that a Retiree's right to Medigap coverage prescription drug coverage was guaranteed, and their healthcare benefits would not be diminished." (Id. ¶¶ 17-18)
Mr. Toussaint's testimony fails to support Petitioners' promissory-estoppel claim for a number of reasons. First, any such claim against Local 100 and Mr. Davis based on promises they allegedly made to union members must, as discussed herein, be dismissed as against them pursuant to GAL § 13. (See supra Part II.A.i.4) Second, to the extent that the claim is against the MTA Respondents for promises they allegedly made to Mr. Toussaint and other Local 100 leadership (which promises Mr. Toussaint and other Local 100 leadership then repeated to union membership), Mr. Toussaint's testimony makes it clear that the alleged promises are founded in the language of the 2002 MOU itself. (See Toussaint Aff. ¶ 15 ("[W]e repeatedly made the same clear and specific promise to the Union's members that MTA made to us in the 2002 MOU." (emphasis added)) As already discussed, however, the 2002 MOU does not guarantee retirees a Medigap-plan offering for life, and to the extent that it guarantees the nondiminishment of retirees' benefits, it does so in a term-limited manner, as the 2002 MOU is expressly effective only until December 15, 2005. (Franceschini Aff., Ex. 1 § 1 at p. 15) Indeed, Mr. Toussaint expressly acknowledges that the 2002 MOU expired on that date. (Toussaint Aff. ¶ 16) The asserted documentary basis for Mr. Toussaint's alleged promises to union members of lifetime Medigap-plan offerings and the nondiminishment of their healthcare benefits provides, therefore, no support for those promises. Pursuant to the Court of Appeals's decision in Bentkowski, promises that are based in documents that do not actually support those promises cannot, in turn, support a promissory-estoppel claim. See Bentkowski, 2025 WL 1697939, at *4 (finding that promises described by affiants were founded in SPDs, but SPDs "undermine[d] the assertion of a clear and unambiguous promise, and the other brochures are no more favorable to petitioners").
Although it is unclear if the Court should even consider them, given that Petitioners did not submit them separately in support of the Amended Petition or the instant motion and otherwise did not incorporate them into the instant motion by reference, the affidavits of the individual Petitioners also do not demonstrate a clear and unambiguous promise that would estop Respondents from eliminating a Medigap-plan offering. There are nine individual Petitioners named in the Amended Petition, all of whom submitted affidavits in support of Petitioners' original motion for a preliminary injunction (Mot. Seq. 1). Eight of those affidavits include the following identical, clearly form statement:
During my retirement the New York City Transit Authority/BSC MTA stated on their site my plan description is Aetna CPPO II Basic (Medicare). TWU Local 100 Retirees Association is an organization within TWU [L]ocal 100 for the Retirees of [L]ocal 100 that has in publication, to retired TWO 100 members, stated that retirees had the option to choose Aetna CPPO II Basic and be reimbursed for Medicare part 'B'.
(Aff. of Anita Clinton, sworn to on Nov. 18, 2023 (NYSCEF Doc. 5), ¶ 2; Aff. of Julio Rivera, sworn to on Nov. 29, 2023 (NYSCEF Doc. 6), ¶ 2; Aff. of Donovan Smith, sworn to on Nov. 20, 2023 (NYSCEF Doc. 7), ¶ 2; Aff. of Harriet Brown, sworn to on Nov. 18, 2023 (NYSCEF Doc. 8), ¶ 2; Aff. of Thomas Massenburg, sworn to on Nov. 18, 2023 (NYSCEF Doc. 9), ¶ 2; Aff. of Eddie Penick, sworn to on Nov. 18, 2023 (NYSCEF Doc. 10), ¶ 2; Aff. of Andreeva Pinder, sworn to on Nov. 18, 2023 (NYSCEF Doc. 11), ¶ 2; Aff. of Neil Thomas, sworn to on Nov. 18, 2023 (NYSCEF Doc. 12), ¶ 2) Nothing in the substance of this statement, however, reflects a promise not to eliminate the CPPO Plan or another Medigap-plan offering in the future or not to otherwise reduce the benefits offered to NYCTA's retirees in the future. Indeed, all this statement reflects is that individual Petitioners were enrolled in the CPPO Plan during their retirement and that Local 100 publications had at some time represented that retirees could enroll in the CPPO Plan. But prior to January 1, 2024, of course NYCTA's website would indicate that the Petitioners' healthcare plan was the CPPO Plan—that was the plan they were enrolled in then. And prior to the open enrollment period for the Aetna MAPs beginning on November 1, 2023, of course Local 100's publications would have informed retirees that they could enroll in that plan—it was still being offered to retirees then.
ii. Irreparable Injury
Petitioners also fail to satisfy their burden to demonstrate that they or other NYCTA retirees will suffer irreparable harm should the Court decline to grant the preliminary injunction that they seek.
To the extent that Petitioners rely on affidavits that describe in a generalized fashion the disadvantages of Medicare Advantage plans as compared to Original Medicare combined with a Medigap plan, the potential harm is speculative and not particularized to the individual Petitioners or the proposed class of retirees. In other words, such affidavits do not set forth how the Aetna MAPs in particular will cause harm to Petitioners or the proposed class. Through reliance on these affidavits, Petitioners instead rely only on the implication that, because Medicare Advantage plans in general possess certain aspects that may render them less desirable or efficacious, the Aetna MAPs will possess those same aspects and will necessarily harm Petitioners and NYCTA's other Medicare-eligible retirees. But Petitioners seek a mandatory injunction requiring Respondents to take the specific action of reinstating a Medigap-plan [*40]offering to Medicare-eligible retirees, after the Medigap-plan offering has already been eliminated in favor of the Aetna MAPs, thus requiring more than a generalized showing that the Aetna MAPs could harm retirees simply because they are Medicare Advantage plans.
In an apparent attempt to address specific harm to retirees, Petitioners submit the affidavits of Mr. Josephson and Ms. Amodeo.[FN13]
Mr. Josephson, in his affidavit, describes wanting to utilize Oak Street Health, Allerton, located in the Bronx, New York, for primary care but being informed by a representative of that clinic that it did not accept the Aetna MAPs. (Josephson Aff. ¶ 6) As a result, because the out-of-pocket costs would be too high, Mr. Josephson avers that he will not be able to receive care through Oak Street Health. (Id.) The MTA Respondents, however, challenge Mr. Josephson's representations through the supplemental affidavit of Mr. Frommeyer. Mr. Frommeyer directly contradicts Mr. Josephson's claim that Oak Street Health does not accept the Aetna MAPs, averring that Oak Street Health in fact participates in the Aetna MAPs' network of providers. (Frommeyer Suppl. Aff. ¶ 39) Further, according to Mr. Frommeyer, since January 1, 2024, Aetna has actually received and paid three claims from Oak Street Health for services rendered to Mr. Josephson. (Id.) Despite having the opportunity to do so, Petitioners have not submitted an affidavit from Mr. Josephson in reply that disputes any of Mr. Frommeyer's statements.
Similarly, Ms. Amodeo avers that she was informed by the Mayo Clinic in Arizona, where she had received treatment under the CPPO Plan, that the clinic would not accept the Aetna MAPs and that she would now have to pay for her care in full and submit the bills to Aetna for reimbursement. (Amodeo Aff. ¶¶ 11-12) Mr. Frommeyer, however, in his supplemental affidavit, disputes that the Mayo Clinic does not accept direct payment from Aetna's Medicare Advantage plans. (Frommeyer Suppl. Aff. ¶ 40) He claims that, "in calendar year 2023, Aetna received 1,833 claims from Mayo Clinic (including its campuses) for Aetna Medicare Advantage plan members and made $1,929,733 in total payments." (Id.) With respect specifically to Ms. Amodeo, Mr. Frommeyer avers that Aetna in fact received a claim from the Mayo Clinic for services rendered to Ms. Amodeo on January 16, 2024, and that Aetna paid the claim on February 10, 2024. (Id.) Again, despite having the opportunity to do so, Petitioners have not submitted an affidavit from Ms. Amodeo in reply.
The individual Petitioners' affidavits also do not help. As the MTA Respondents point out, these affidavits allege—via form language—only speculative concern about future healthcare coverage under the Aetna MAPs, not any particularized harm that the Aetna MAPs have or will cause the individual Petitioners.[FN14]

Despite Petitioners' arguments to the contrary, this case involves circumstances that are distinct from those involved in Bentkowski. Here, Petitioners seek a preliminary injunction after the CPPO Plan has been eliminated and retirees' enrollment in the Aetna MAPs implemented, whereas, in Bentkowski, the petitioners sought and received a preliminary injunction before the City implemented its policy. Thus, if the switch from the CPPO Plan to the Aetna MAPs caused widespread disruption to NYCTA retirees' healthcare coverage, then Petitioners, unlike the petitioners in Bentkowski, could have provided actual evidence of that disruption. Yet they submit only Mr. Josephson's and Ms. Amodeo's affidavits, which do not even withstand scrutiny in light of Mr. Frommeyer's contradictory testimony.
Further, the petitioners in Bentkowski submitted affidavits from hundreds of City employees. 2025 WL 1697939, at *2. Even counting each of the individual Petitioners affidavits, which, for reasons already discussed, do not allege any nonspeculative harm, Petitioners submit only 11 affidavits from NYCTA retirees who even attempt to articulate some form of harm. But that harm falls short. Again, the Court must evaluate the evidence presented in context of Petitioners' request for a mandatory injunction.
iii. Balance of the Equities
The "balancing of the equities" prong of the preliminary-injunction analysis "requires the court to look to the relative prejudice to each party accruing from a grant or denial of the [*41]requested relief." Suttongate Holdings Ltd. v. Laconm Mgmt. N.V., 159 AD3d 514, 515 (1st Dep't 2018). Here, if it is assumed that the harms that Petitioners claim will befall them and other Medicare-eligible retirees have actually occurred or are likely to occur, then the balance of the equities favors Petitioners and the other retirees, even despite Respondents' claims concerning the administrative and financial burden that would result from being required to resume offering a Medigap plan substantially similar to the CPPO Plan. But Petitioners have established neither likelihood of success on the merits of their claims nor actual or imminent irreparable harm from denial of the injunction.
The Court has considered the additional contentions of the parties not specifically addressed herein. To the extent that any relief requested by the parties was not addressed by the Court, it is hereby denied.
Accordingly, it is hereby
ORDERED that Mr. Davis's motion, pursuant to CPLR 3211(a)(2) and (7), to dismiss the Amended Petition (Seq. No. 3) is GRANTED in accordance herewith; and it is further
ORDERED that Aetna's motion, pursuant to CPLR §§ 1012, 1013, and 7802(d), for leave to intervene (Seq. No. 4) is DENIED in accordance herewith; and it is further
ORDERED that Petitioners' motion, pursuant to CPLR Article 63, for a preliminary injunction (Seq. No. 5) is DENIED in accordance herewith; and it is further
ORDERED that the MTA Respondents' motion, pursuant to CPLR § 7804(f) and 3211(a)(1), (5), (7), and (10), to dismiss the Amended Petition (Seq. No. 6) is GRANTED IN PART in accordance herewith; and it is further
ORDERED and ADJUDGED that Petitioners' Amended Petition is DENIED and DISMISSED as against all parties; it is further
ORDERED that the MTA Respondents shall serve a copy of this Decision and Order upon all other parties and the Clerk of the General Clerk's Office with notice of entry within twenty (20) days thereof; and it is further
ORDERED that service upon the Clerk shall be made in accordance with the procedures set forth in the Protocol on Courthouse and County Clerk Procedures for Electronically Filed Cases (Revised August 15, 2019);[FN15]
and it is further
ORDERED that any requested relief not expressly addressed herein has been considered and is denied; and it is further
ORDERED that the Clerk shall mark Motion Sequence Nos. 3, 4, 5, and 6 decided in all court records; and it is further
ORDERED that the Clerk shall mark this proceeding disposed in all court records.
This constitutes the decision, order, and judgment of the Court.
DATE October 21, 2025
SHAHABUDDEEN A. ALLY, A.J.S.C.

Footnotes

Footnote 1: The Amended Petition is dated March 11, 2024, but it is marked as received in NYSCEF on March 15, 2024. (See Am. Pet. at 28, header) The NYSCEF clerk returned the Amended Petition for correction, noting that the so-order stipulation allowing for filing of the amended pleading (NYSCEF Doc. 92) did not permit Petitioners to add Mr. Davey as a named respondent. As of the date of this Decision and Order, NYSCEF still indicates that the Amended Petition has been returned for correction, and neither the MTA, NYCTA, Local 100, nor Mr. Davey have officially been added as party respondents in NYSCEF.

The NYSCEF clerk should not have rejected the filing of the Amended Petition in its current form. The relevant so-ordered stipulation provides that "Petitioners will file an amended petition" and that "Petitioners intend to join MTA, NYCTA, and TWU Local 100 as parties in the Amended Petition." (NYSCEF Doc. 92, ¶ 3) This language does not expressly prohibit the joining of additional parties, and the NYSCEF clerk should not have exercised discretion to interpret it as doing so. Further, even if the so-ordered stipulation included a limitation on who could be joined in any subsequently filed amended petition, the parties and the Court are best equipped to determine whether that limitation was violated and to seek and award the appropriate remedy. Indeed, when Mr. Davis's counsel requested that the Amended Petition be struck from the docket because it was filed a few days after the stipulated date, the Court declined to do so in an Interim Order dated March 18, 2024. (Id. Docs. 118-19) (Remarkably, the NYSCEF clerk also returned the Court's Interim Order for correction.) No party to the original petition has objected to Mr. Davey's inclusion—nor, furthermore, has Mr. Davey himself, other than on the unrelated grounds asserted in the MTA Respondents' pending motion to dismiss.

The Amended Petition is the operative pleading, and the parties correctly treat it as such.

Footnote 2:Significant confusion exists surrounding Mr. Davis's motion, Motion Sequence No. 3. On December 21, 2023, counsel for Mr. Davis, Arthur Schwartz, filed a proposed Order to Show Cause seeking to dismiss the Petition and to vacate a temporary restraining order ("TRO") that the Court had entered on Petitioners' original motion for a preliminary injunction, which was filed on December 12, 2023, in connection with the Petition and before the changes to the healthcare plans that are at issue in this proceeding went into effect on January 1, 2024. (NYSCEF Docs. 2, 25, 63, 73) By stipulation executed by the original parties to the proceeding on January 29, 2024, and so-ordered and entered by the Court on January 30, 2024, it was agreed that Motion Sequence No. 1 (Petitioners' original motion for a preliminary injunction) and Motion Sequence No. 2 (Ms. Miller's and Mr. Jefferson's motion to vacate the TRO) were voluntarily withdrawn. (NYSCEF Doc. 92) Mr. Davis's motion (Seq. No. 3) was not withdrawn, however, but that portion of it seeking to vacate the TRO was necessarily rendered moot by the withdrawal of Motion Sequence No. 1. In the stipulation, the parties further agreed that Petitioners would file the Amended Petition and a renewed motion for a preliminary injunction by a date certain and that respondents (whoever they may be after filing of the Amended Petition) would file motions to dismiss as well as opposition to the forthcoming preliminary-injunction motion by dates certain. (Id.)

The MTA Respondents filed their instant motion to dismiss the Amended Petition on March 25, 2024. (NYSCEF Doc. 126) It was designated Motion Sequence No. 6. The next day, March 26, 2024, Mr. Schwartz filed a "Notice of Amended Motion to Dismiss"(emphasis added), along with a declaration from Mr. Schwartz and eight exhibits. (NYSCEF Docs. 134-143) What the original motion to dismiss is, however, is unclear. The Court can only assume that it is Motion Sequence No. 3. Additionally, Mr. Schwartz did not specify the grounds on which he was seeking dismissal, only stating, "Plaintiff shall move this Court on May 9, 2024, at 2:30 PM." Of course, Mr. Schwartz also does not represent a "plaintiff" in this proceeding—nor are there any plaintiffs at all, only petitioners. Further complicating matters, for reasons unknown, the NYSCEF clerk designated the "Notice of Amended Motion to Dismiss" and related documents as Motion Sequence No. 6. Thus, there appears to be two separate motions pending under Motion Sequence No. 6. In a subsequent stipulation between the parties concerning the briefing schedules on the motions, however, the parties recognized the existence of the motion instituted by the "Notice of Amended Motion to Dismiss" as a separate motion—indeed, as an amendment to Motion Sequence No. 3. (See NYSCEF Docs. 152 ("On or before April 29, 2024, Petitioners will file any opposition to Respondents' motions to dismiss, Motion Sequence No. 6 and No. 3, as amended by TWU Respondents' notice of motion filed on March 26, 2024 (NYSCEF Doc. 134)." (emphasis added)) The NYSCEF docket for this proceeding is, in short, a mess.

Further confusion flows from the fact that, in the caption affixed to the "Notice of Amended Motion to Dismiss," Mr. Schwartz does not include the additional respondents named in the Amended Petition, even though Mr. Schwartz clearly recognizes that the Amended Petition is the operative pleading, because he titles his accompanying declaration the "Declaration of Arthur Z. Schwartz in Support of Motion to Dismiss the Corrected Amended Petition and in Opposition to the Motion for a Preliminary Injunction" (emphasis added) and addresses therein causes of action that only exist in the Amended Petition. (NYSCEF Doc. 135 at 1, ¶¶ 24-26) Mr. Schwartz also states in his declaration only that he represents Mr. Davis. (Id. ¶ 1) The Court emailed Mr. Schwartz, copying counsel for all other parties, on June 26, 2025, seeking clarification as to whether Mr. Schwartz also represented Local 100 in addition to Mr. Davis and if Local 100 was also moving to dismiss the Amended Petition. Mr. Schwartz replied later that day, asserting that "Local 100 was sued as 'Richard Davis as President of Local 100 Transport Workers Union.['] This is because union's [sic] themselves cannot be sued in their name under General Associations Law Section 13." He then quoted language that purports to be from General Associations Law ("GAL") § 13 and repeated arguments made in his motions that Petitioners' claims against Mr. Davis are de facto claims for breach of the duty of fair representation, which he argues are improper and should be dismissed.

Mr. Schwartz is incorrect that Local 100 has not been sued in its own name in this proceeding. The Amended Petition expressly names Local 100 separate from Mr. Davis. It may be true that GAL § 13 precludes Local 100 from being sued directly, but Local 100 must make that argument in a motion to dismiss. Mr. Schwartz cannot simply pretend that Local 100 was not named as a respondent. Nowhere does Mr. Schwartz raise his argument concerning Local 100 in any declaration submitted in this proceeding. Therefore, the Court will not consider that argument at this time. Nevertheless, if Mr. Davis is dismissed from this proceeding based on Mr. Schwartz's arguments, Local 100 would per force need to be dismissed as well.

Footnote 3:Oral argument on the four motions was held before the Court on June 10, 2024. (See NYSCEF Doc. 168)

Footnote 4:Although Petitioners do not cite the allegations in their memorandum of law, the Court notes that Petitioners allege that "most Retirees" or "many Retirees" did not receive "promised comprehensive packages from Aetna with detailed information about Aetna's MAPs." (Am. Pet. ¶¶ 89, 136) These allegations do not state that the named Petitioners were amongst those who did not receive the information packages, and they expressly concern information about the Aetna MAPs, not the relevant issue of NYCTA no longer offering the CPPO Plan or an alternative Medigap plan.

Footnote 5:CPLR § 901(a) provides that "[o]ne or more members of a class may sue or be sued as representative parties on behalf of all if:"
1. the class is so numerous that joinder of all members, whether otherwise required or permitted, is impracticable;
 
2. there are questions of law or fact common to the class which predominate over any questions affecting only individual members;
 
3. the claims or defenses of the representative parties are typical of the claims or defenses of the class;
 
4. the representative parties will fairly and adequately protect the interests of the class; and
 
5. a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Footnote 6:In reply, the MTA Respondents assert that Petitioners "concede that there are individual questions of fact concerning how the changes to plan offerings impact class members, including whether any individual has suffered injury or not," citing Petitioners' opposition at page seven. (MTA Resp'ts' Reply at 4-5) The Court, however, discerns no such concession in Petitioners' opposition.

Footnote 7:The Court may consider the language of the 2023 MOU in deciding the motion because it is expressly incorporated by reference into the Amended Petition and otherwise constitutes documentary evidence within the meaning of CPLR 3211(a)(1).

Footnote 8:In Bender, the Court of Appeals "held that, subject to the development of additional evidentiary facts, the doctrine of equitable estoppel might be invoked to permit the filing of notices of claim nunc pro tunc under section 50-e of the General Municipal Law during a period of particular confusion incident to the transfer of operational control of municipal hospitals from the city to the Health and Hospitals Corporation." Hampton Hosp. & Med. Ctr., 52 NY2d at 93 n.1. The Court of Appeals explained that its holding applying equitable estoppel "to notice of claim situations" was purposed to "insure that statutes like section 50-e of the General Municipal Law do not become a trap to catch the unwary or the ignorant." Bender, 38 NY2d at 668 (internal quotation marks and citation omitted). General Municipal Law § 50-e (or another comparable statute) is not at issue in this case.

Footnote 9:In the absence of any decision of the Court of Appeals expressly rejecting this rule, the Court is of course obligated to follow and apply it here. The Court finds it difficult, however, to square this rule with Court of Appeals precedent.

Initially, the rule appears to have been created by the First Department. In Bentkowski, the First Department cites three cases in support of the rule: Walter, 256 AD2d at 9; Doctors Council v. New York City Employees' Retirement System, 127 AD2d 380, 394 (1st Dep't 1987), rev'd on other grounds, 71 NY2d 669, 674-77 (1988); and McManus v. Board of Education of Hempstead Union Free School District, 87 NY2d 183, 186-87 (1995). In Walter, the First Department, citing to Doctors Council and Wolff v. Hodson, 285 NY 197, 201-02 (1941), held that "equitable estoppel is available against the [NYPD] with respect to its discretionary actions, i.e., matters over which it has the power to decide." 256 AD2d at 9. In Doctors Council, the First Department extrapolated from Bender that "a governmental entity may be estopped from taking action where it is acting within the realm of discretion rather than in accordance with a statutorily imposed mandatory duty." Doctors Council, 127 AD2d at 393. This extrapolation of a broad rule from Bender, however, does not seem to comport with the Court of Appeals's pronouncements in Hamptons Hospital & Medical Center that Bender addressed an unusual factual situation and "is of very limited application and should not be read as diminishing the vitality of the general rule." 52 NY2d at 93 n.1. Wolff was issued in 1941. While this of course does not mean that Wolff is no longer good law, the Court of Appeals's opinion in that case does not state outright the rule that the First Department takes from it; only by implication can that rule be fashioned from the opinion. McManus, finally, also does not articulate any such rule explicitly. See 87 NY2d at 186-87.

Compare these cases with Advanced Refractory Technologies, 81 NY2d 670. Therein, the Court of Appeals held that "nothing in the plain language of the Niagara Redevelopment Act, the contracts entered into pursuant to that act, or Public Authorities Law [PAL] § 1005(5) compels [the Power Authority of the State of New York] to sell . . . replacement power at cost." Id. at 674. Thus, the Power Authority's setting of power rates was a discretionary act, something that was authorized by statute but nonetheless, as phrased in Walter, a "matter[] over which [the agency] has the power to decide," within certain limits set by PAL § 1005(5). The Court of Appeals rejected the petitioners' argument that the Power Authority was not engaged in a governmental function because it sold power pursuant to contract, found that, "[i]n setting rates for the sale of hydroelectric power, [the Power Authority] was engaged in a governmental function," and held that the rule prohibiting application of estoppel to government agencies applied to bar the promissory-estoppel claim against the Power Authority. Id. at 677-78.
The Court struggles to fashion a principled distinction between the Court of Appeals's opinion in Advanced Refractory Technologies and this case. Here, under PAL § 1204(6), NYCTA was expressly granted the authority to "appoint employees and fix their compensation." To do so, because its employees were represented by a union (Local 100), NYCTA engaged in collective bargaining with the union to enter into contractual agreements determining the employees' compensation, which was provided in part through sponsored healthcare plans. Just like the Power Authority in Advance Refractory Technologies, NYCTA was exercising discretion within the confines of its express statutory authority.

A reconciliation might be achieved if the phrase "acting in a governmental capacity," as used in the Court of Appeals's articulation of the general rule against application of estoppel to government agencies, possesses a narrower meaning than simply acting within statutory authority. For example, here NYCTA could be said to be acting more in its capacity as employer than as a government entity. The problem with that interpretation, however, is that PAL § 1202(2) expressly provides that NYCTA "shall be regarded as performing a governmental function in carrying out its corporate purpose and in exercising the powers granted by this title." (emphasis added) The power to "appoint employees and fix their compensation" is one granted to NYCTA under that title.

Footnote 10:The First Department's decision in Bentkowski was issued subsequent to the final submission of the motions now under consideration here. Thus, no party could have raised the First Department's holding in their motion papers. Yet Walter, 256 AD2d 8, the decision on which Bentkowski primarily relies, was issued in 1998. On the relevant point, Walter and Bentkowski are directly applicable precedent that the Court cannot ignore, even though no party has independently brought them to the Court's attention.

Footnote 11:The Court of Appeals observed:
 While we have never recognized promissory estoppel as a standalone cause of action, the Appellate Division has done so in at least some circumstances. . . . The Appellate Division has not, however, expressly decided whether a promissory estoppel cause of action can be based on promises made while the relevant question was a mandatory subject of collective bargaining. Here, we need not decide whether to recognize a promissory estoppel cause of action, either generally or in this particular context, because petitioners have failed to establish the existence of a clear and unambiguous promise.
Bentkowski, 2025 WL 1697939, at *3.

Footnote 12:By stark contrast, in Bentkowski, the petitioners submitted affidavits from hundreds of Medicare-eligible retirees from City employment alleging a promise, and, additionally, one affidavit from an individual who worked for the City for decades in various capacities, including as Deputy Mayor of Health and Human Services, indicating that this individual had hundreds of conversations with City employees explaining the healthcare benefits that they would receive. 2025 WL 1697939, at *2. And yet the Court of Appeals found that even these affidavits were not sufficient to establish a clear and unambiguous promise. See id. at *4.

Footnote 13:On September 3, 2025, Petitioners' counsel submitted a letter to the Court urging it to decide these pending motions as soon as possible and attached as an exhibit thereto a collection of affirmations from 17 individuals (including, it appears, Petitioner Archer), ranging in date of execution from May 20, 2024, to June 24, 2025, claiming to have either been informed that a physician or hospital did not accept the Aetna MAPs or been denied a medical procedure or medication. (NYSCEF Docs. 165-166) The MTA Respondents subsequently submitted a letter objecting to the late filing of such affirmations and to the Court's consideration of them in deciding Petitioners' motion for a preliminary injunction. (Id. Doc. 167)

Because the submission of these affirmations was both unauthorized and comes more than a year and half after the motion was filed (and almost equally as long after oral argument), the Court declines to consider the affirmations in deciding the motion. Even if the Court were to consider them, however, it likely would not alter the Court's conclusion. Most do not even state that the affirmant is a NYCTA retiree, had previously been enrolled in the CPPO Plan, or is currently enrolled in one of the Aetna MAPs. These deficiencies alone render almost all of the affirmations devoid of any weight. Further, some of the affirmations allege that the affirmant was eventually able to undergo the procedure or acquire the medication upon appeal and otherwise fail to explain how any delay caused the affirmant irreparable harm. And still some others are completely bereft of any supporting details, consisting only of a simple "Yes" answer to the form questions of whether the affiant had been told that a physician or hospital that they or it did not accept the Aetna MAPs.

Also part of the collection of affirmations attached to Petitioners' counsel's letter is an affirmation, apparently from Petitioner Smith, attempting to respond to Respondents' argument that the MOUs are effective only for specific terms. Again, the Court does not consider this affirmation because of its unauthorized and extremely tardy submission. But even if it were considered, the affirmation does not refute Respondents' argument, legally or factually, or undermine the Court's conclusions based on the plain language of the MOUs in question.

Footnote 14:Petitioners Brown and Penick were not even Medicare-eligible when the renewed motion for a preliminary injunction was filed, so they could not have stated any particularized harm at that time caused by the elimination of the CPPO Plan. (Scholl Aff. ¶ 3(a)) Petitioner Archer, while Medicare-eligible, was not enrolled in the CPPO Plan but was enrolled in the original Option 1 Aetna MAP, and so he also could not have been harmed. (Id. ¶ 3(b)) Petitioners have submitted no evidence contradicting the MTA Respondents' claims about Petitioners Brown's and Penick's Medicare eligibility or Petitioner Archer's enrollment in the original Option 1 Aetna MAP.

Footnote 15:The protocols are available at https://www.nycourts.gov/LegacyPDFS/courts/1jd/supctmanh/Efil-protocol.pdf.